ARTHUR J. KOENIGSTEIN V. STATE OF NEBRASKA.

FILED MAY 5, 1917.   No. 19418.

1. **Jury: SPECIAL VENIRE.**   Section 9106 Rev. St. 1913, .applies only when two or more persons are charged in the same indictment or information, and one of them so charged has had a separate trial. Under that section to obtain a new jury the clerk must procure a list of 60 electors of the county, and the jury is selected from this list.

2. ———: **ADDITIONAL JURORS.**   Under section 8143 Rev. St. 1913, the court orders the sheriff to "summon without delay good and lawful men, having the qualifications of jurors." These are summoned from the body of the county, and the sheriff is not required to apportion them equally to all .parts of the county. Such a method of selecting jurors to try a particular case is exceptional, and should not be lightly resorted to.

3. **Criminal Law: FORMER JEOPARDY.**   *Res adjudicata* is a fundamental principle in civil cases, and the corresponding principle in criminal cases is that no one shall be twice put in jeopardy for the same offense. It is only when the same matter is in issue in both cases that the defendant can be said to be put in jeopardy for the same offense in both cases. A trial jury is not expected to base its opinion of the weight of the evidence upon the opinion of other men, and is not to be influenced by the consideration of what any other jury has or might have done upon the same state of facts.

4. ———: **EVIDENCE: RECEIVING BRIBES.**   But under the general allegation of an indictment that the defendant received a bribe from a specified keeper of a disorderly house, it is competent to prove that the defendant adopted a plan or system requiring each and all of the disorderly houses in the vicinity to pay him a specified sum to prevent prosecutions; and that pursuant to that plan not only the person alleged, but also other persons similarly situated, paid defendant such bribes.

5. ———: ———: ———: **FORMER ACQUITTAL.**   Under such circumstances the former acquittal of the defendant upon an indictment charging him with receiving a bribe from the keeper of one of such disorderly houses will not exclude evidence of that offense upon a subsequent trial of an indictment for receiving a bribe from the keeper of another such house. Such evidence is allowed only for the purpose of strengthening the evidence of the offense charged in the subsequent trial by showing the general

plan or system under which the bribe was received. The two
crimes are distinct, and neither is an element of the other. But
when such evidence is introduced the defendant should be allowed
to prove his acquittal on the former trial.

6. ———: INSTRUCTIONS: DUTY OF COURT. In instructions intended
to guard against mistakes or oversight by the jury, if the in-
terest of the court or of the state at large in the conviction of
the guilty is suggested, care should be ˙taken to avoid the im-
pression that this is of more importance than is the acquittal of
the innocent. It is erroneous to impress upon the jury the
importance of the conviction of the guilty without also as effective-
ly guarding against the conviction of the innocent.

7. ———: MISCONDUCT OF JUROR. The jury must determine the is-
sues submitted solely upon the evidence admitted in open court
upon the trial. If any juror assumes to state facts that may be
known to him, which might influence the verdict, and which were
not admitted by the court with opportunity for cross-examination,
such misconduct will vitiate the verdict and require a new trial.

ERROR to the district court for Madison county: ANSON
A. WELCH, JUDGE. *Reversed.*

*Reese, Reese & Stout, H. F. Barnhart* and *Jack Koenig-
stein,* for plaintiff in error.

*Willis E. Reed, Attorney General, Charles S. Roe* and
*William L. Dowling, contra.*

SEDGWICK, J.

The defendant was found guilty of accepting a bribe
while acting as county attorney of Madison county, and
was sentenced to imprisonment in the penitentiary from
one to five years. He has brought the case to this court
for review.

The first questions presented are as to the impaneling
of the jury. It appears that there were two indictments
pending against the defendant at the same time; both
charging him with accepting bribes from respective keep-
ers of disorderly houses in or near the town of Norfolk.
The defendant was tried upon one of these indictments and
found not guilty, and at the same term the case at bar was
about to be tried, and the prosecuting attorney filed a mo-
tion "to discharge the regular panel of jurors summoned

Koenigstein v. State.

for the special September, 1915, term of said court, and to
enter an order causing a special venire of jurors to be
called to try the above entitled cause." It appears that
upon the former trial of the defendant at the same term
of court it was contended, and there was some evidence in-
dicating, that while he was county attorney he had re-
quired each one of the disorderly houses in the town to
pay him a regular monthly bonus, and in consideration of
such payment had refrained from prosecuting them. The
indictment indicated that the same contention would be
made in the case at bar. The jurors of the regular panel
had all heard the evidence in the case that had been tried,
eleven of them were upon the jury that tried the case, and
the remainder of the members of the panel were in the
courtroom more or less at the time of the trial and heard
the evidence and argument of counsel. Upon these facts
the court discharged this regular panel, and directed the
sheriff to "summon without delay twenty-four (24) good
and lawful men, having the qualifications of jurors, to fill
and complete the panel." This was done immediately, and
the defendant filed a motion and affidavit objecting to the
jurors summoned by the sheriff. In an affidavit filed by
him he stated "that the regular panel and bystanders are
incompetent, because of having heard the evidence, or a
part thereof, in the former trial, to sit as jurors in this
cause." This proceeding of the court in quashing the panel
was not authorized by section 9106, Rev. St. 1913. That
section applies when two or more persons are charged in
the same indictment or information, and one of them so
charged has had a separate trial. If then the court is "sat-
isfied, by reason of the same evidence being required in the
further trial of parties to the same indictment or informa-
tion, that the regular panel and bystanders are incompe-
tent, because of having heard the evidence, to sit in further
causes in the same indictment or information," then the
court may require the clerk to prepare a list of 60 electors
of the county, and the jury is to be selected from this list.
This method of proceeding was not followed, the court un-

derstanding that the section did not apply in this case, but
the motion of the prosecuting attorney to quash the panel
was sustained apparently because the court found that each
and every juror upon the panel was disqualified to sit,
having already heard the evidence in the case, and of
course having heard the public discussion that would fol-
low after the first trial. Under these circumstances, if the
jurors of the regular panel had been severally examined on
their *voir dire,* none of them would have been allowed to
sit in this case, and therefore excluding them under this
general order was not erroneous.

The order of the court directing the sheriff to summon
24 jurors was authorized by section 8143, Rev. St. 1913:
"Whenever at any general or special term, or at any period
of a term for any cause there is no panel of grand jurors or
petit jurors, or the panel is not complete, said court may
order the sheriff, deputy sheriff, or coroner to summon
without delay good and lawful men, having the qualifica-
tions of jurors." Under this order of the court the sheriff
called 24 jurors, and the defendant then filed an objection
"to the panel of petit jurors summoned for the trial of this
cause by the sheriff of Madison county." The grounds of
this objection alleged by the defendant were because a list
of persons from which this jury was drawn was composed
of persons residing in one particular locality of the county,
and none of the jurors were selected "from residents of
Norfolk precinct which contains at least one-third of the
population of the county," or from six other specified pre-
cincts of the county. "The prisoner has the right to insist
that the list of persons from which the panel is drawn be
filled in due proportion from all of the precincts within
the trial district, and not from a part only." *State v.
Page,* 12 Neb. 386. In the same case it is said that, if the
county commissioners in preparing the regular jury list
overlooked a precinct containing one-third of the whole
number of persons in the trial district qualified to serve,
the panel would be illegal, but in such case "the court has
ample authority to provide a lawful jury under section

664 (Rev. St. 1913, sec. 8143)." *Barney v. State,* 49 Neb. 515. Under section 664 the sheriff summons "good and lawful men, having the qualifications of jurors." These are to be called from the body of the county, and the sheriff is not required to apportion them equally to all parts of the county. This point was determined in *Welsh v. State,* 60 Neb. 101, in which case the court said: "In cases where a jury is drawn in the manner prescribed by said section 658 *et seq.* of the Code of Civil Procedure the provisions thereof must be observed. That they are mandatory we do not doubt, particularly those provisions which require that the panel must consist of persons drawn, as nearly as may be, from all portions of the county, in proportion to their population, and this we understand to be the rule laid down in most of the cases of this court cited by counsel for defendant in support of the proposition that the panel in this case was illegal. But no such requirement is prescribed by section 664, hence it was unnecessary that the jury in this case be so selected." Such a method of selecting jurors to try a particular case is exceptional and should not be lightly resorted to. It was said in the case last cited: "The authority conferred by this section should be sparingly exercised and exigencies should not be purposely created by the courts for its exercise. This defendant suffered no injustice through such proceeding, and the lower court must be sustained in its action."

The next objection presented in the brief is: "The court permitted the introduction of evidence of the identical acts complained of in the former charge (trial), which had been found not true, and refused to permit the introduction of evidence of such acquittal." The theory of the prosecution was that the defendant as county attorney adopted a plan or system of requiring each and all of the disorderly houses in the town to pay him a specified sum to prevent prosecutions. The first witness introduced by the state testified that he was a driver of a taxicab, engaged in carrying passengers from place to place in the town for hire, and that he, at the defendant's request, took him to each

of the disorderly houses in the town, and that afterwards the witness received money from each of the keepers of these houses at or·about the first of each month and delivered the money to this defendant. It appears to be seriously contended that the indictment is not sufficient to admit this class of testimony, but there seems to be no ground for this contention. In *Guthrie v. State,* 16 Neb. 667, several questions were considered. The indictment in that case alleged the receipt of $300 as a bribe, and alleged that the $300 was paid by one Branch "and other persons whose names are to the jurors unknown." The proof showed that it was paid by Branch alone, and it was held that there was no fatal variance between the allegation and the proof. In the case at bar the allegation is that $75 was paid by Nannie Meyers and Riley McLimans and there was proof that the $75 was so paid. The indictment continued, stating how and for what purpose the $75 was paid, and in that regard alleges that it was paid for the purpose of permitting Nannie Meyers "and other persons to the grand jurors unknown" to carry on unlawful business. The proof tends to establish that the $75 charged in the first count of the indictment as paid by Nannie Meyers and McLimans was paid in pursuance to a general plan and system whereby similar amounts were to be paid by other persons and all persons so paying were to be protected from prosecution. Under the opinion in *Guthrie. v. State, supra,* this proof would have been admissible under the general allegation of payment by Nannie Meyers and Riley McLimans. The court said: "It is clearly shown that the agreement was a continuing one, and contemplated a system of payments to be made in the future, and for which the same course was to be pursued by plaintiff in error as for the $300. It was known by plaintiff in error when Branch received money, and no gambling house was molested after its share of the money had been paid. He was fully advised of what occurred in the workings of the plans and designs, not only at the time of the receipt of the $300, but at all times, so long as the system under

which they were working continued.   This system was fully developed and exposed by Branch in his testimony. It was properly admitted as a part of the transaction in which the $300 was paid by Branch to plaintiff in error. The fact of the carrying out of this system was proper evidence for the purpose of corroborating the testimony of Branch, and showing the purpose, understanding, and intent with which the money was received as alleged in the indictment, and for the purpose of showing the system under which these several transactions were had."

And, so in the case at bar, under the allegation that $75 was paid for such purpose by Meyers and McLimans, it was competent to prove that it was paid under a system by which all violators of the laws similarly situated were to make similar payments and were to be protected.   This seems to be well supported by authority.   Judge Wharton says: "When the object is to show system, subsequent as well as prior collateral offenses can be put in evidence, and from such system identity or intent can often be shown.  The question is one of induction, and the larger the number of consistent facts, the more complete the induction is."   Wharton, Criminal Evidence (10th ed.) sec. 146.

In *Frazier v. State,* 135 Ind. 38, the court adopted the following language quoted from text-writers: "A series of mutually dependent crimes may be shown where they tend to prove that they were committed under a system which becomes relevant to the inquiry."

In *Wallace v. State,* 41 Fla. 547, the law is declared to be: "Where the crime in question is one of a system of criminal acts occurring so near together in point of time and so nearly similar in means as to lead to the logical inference that they are all mutually dependent and committed in pursuance of the same deliberate criminal purpose and by means planned beforehand, evidence of such other acts is admissible, even though those acts amount to another criminal offense."   This seems to be the general rule.

The evidence admitted to show this plan and system of the defendant included evidence of money received from one Fern McDonald, which was the substance of the charge upon which the defendant had been formerly tried and acquitted. In rebuttal the defendant offered in evidence the indictment in the former case identifying the payments so received as the same payments upon which the defendant was formerly tried. The defendant then offered in evidence the verdict of acquittal in the former case. Upon objection of the state this was excluded. The general rule is that the verdict of the jury in another case between different parties is not competent evidence of the fact so found by the jury. The reason of that rule is that the verdict of one jury is not evidence to be considered by another jury in determining the same question. But in this case the former trial was between the same parties as the present trial. The defendant relies upon *Mitchell v. State*, 103 Am. St. Rep. 17 (140 Ala. 118), which holds: "If, on the trial of an accused for the commission of one crime, evidence is permissible and is introduced of the commission of another similar crime for the purpose of showing the intent with which the crime charged was committed and the identity of the accused as the person who committed it, he is entitled to introduce in evidence the record of a court showing his trial and acquittal for such other crime. Such evidence is admissible under the doctrine of *res adjudicata*." And it is said in the opinion: "Whether the production in evidence of a record such as defendant offered to produce would have rendered the state's evidence of the burning of Murphey's house subject to exclusion is not a question here raised or determined." It would seem that if his acquittal in the former trial for a distinct offense would be *res adjudicata* of the principal fact therein charged, so as to determine that question for the subsequent trial for another offense, it would be the duty of the court in the subsequent trial to instruct the jury that it was established that this defendant did not receive the bribe so charged as the substance of the former offense. The receiving of a bribe

from Fern McDonald was the substance of the offense charged in the former trial, and undoubtedly the state could not rely upon such allegation as the substance of any subsequent charge, or as an essential element of any criminal charge against the defendant. The Constitution prevents putting a person in jeopardy the second time for the same offense, and when the essential element of any crime has been determined the defendant cannot be again required to defend against it. The receipt of bribes from Fern McDonald is not in issue in this case. It is only when the same matter is in issue in both cases that the defendant can be said to be put in jeopardy for the same offense in both cases. Parker, C. J., in *King v. Chase*, 15 N. H. 9, 41 Am. Dec. 675, speaking of *res adjudicata* in civil cases, said: "Any fact attempted to be established by evidence, and controverted by the adverse party, may be said to be in issue, in one sense. As, for instance, in an action of trespass, if the defendant alleges and attempts to prove that he was in another place than that where the plaintiff's evidence would show him to have been at a certain time, it may be said that this controverted fact is a matter in issue between the parties. This may be tried, and may be the only matter put in controversy by the evidence of the parties. But this is not the matter in issue, within the meaning of the rule. It is that matter upon which the plaintiff proceeds by his action, and which the defendant controverts by his pleadings, which is in issue.    *    *    *    But facts offered in evidence to establish the matters in issue are not themselves in issue, within the meaning of the rule, although they may be controverted on the trial." This doctrine has been repudiated by some text-writers, and also by some courts, but appears to us to be sound.

*Res adjudicata* is a fundamental principle in civil cases, and the corresponding principle in criminal cases is that no one shall be twice put in jeopardy for the same offense. This distinction is stated by Judge Wells: "The principle —which is parallel to the principle prevalent as the fundamental rule in civil cases—is that no one shall be twice

put in jeopardy for the same offense. And, accordingly, the primary inquiry under it is, when does jeopardy attach, so as to be a bar to any subsequent prosecution?" Wells, Res Adjudicata and Stare Decisis, 318, 319.

But in the present trial the defendant is not put in jeopardy of conviction of receiving bribes from Fern McDonald. The payment by her is not an element of the crime for which he is now tried. That evidence could not be omitted in proving the general plan and design under which the money was received from Nannie Meyers, and so far as such evidence is allowed it is only for the purpose of strengthening the evidence of the substantial charge now being tried. The trial jury is not to be controlled by the consideration of what any other jury has or might have done upon the same state of facts. They are not expected to base their opinion of the weight of evidence upon the opinions of other men. Under the holding of Parker, C. J., above quoted, this evidence would not be excluded in the application of *res adjudicata* in civil cases. At all events it seems that receipt of such evidence cannot be said to put the defendant in jeopardy the second time for the same offense. We think the evidence of the receipt of bribes from Fern McDonald, tending as it does to prove the general system or plan of defendant, was competent. The fact that defendant was acquitted of that crime in the former trial is not to be considered as *res adjudicata* in this trial. While the forming of the plan and purpose of exacting money in .the nature of bribes from all of the disorderly houses of the town and vicinity would not of itself constitute a crime defined in our law and subject to punishment, the act of accepting a bribe being the substance of the crime so defined, yet the fact of forming and attempting to execute such a general plan would, if proved, strongly support the evidence of the definite crime charged. The state attempted to prove more payments of that nature by the witness Fern McDonald than by any other person. It appears also that in the former trial the state attempted to prove the same corrupt plan and purpose as was made

so prominent a feature in the trial of the case at bar. While this general plan was not an element of the crime charged, and the result of the trial did not necessarily depend upon the existence or nonexistence of such plan and purpose, still it was a question of fact in evidence in both trials, and a very important one. Without this evidence it may well be doubted whether the defendant would have been convicted in the case at bar. While the verdict of acquittal in the former trial is not to be considered as determining that collateral question for the purpose of the subsequent trial for a distinct offense, we think that, when so much of the the evidence of the former trial was before the jury in the case at bar, justice required that the former verdict should also have been allowed in evidence.

The statute authorizing the court to require the sheriff to call jurors from the bystanders or from the body of the county for the trial of a particular case should be made use of only when it is reasonably certain that the case to be tried will not be prejudiced by such method of selecting a jury. Under the circumstances in this case it would not in general be expected that a jury would be so selected. If the defendant is to be successively tried upon charges which in the law are regarded as distinct from each other, and yet which admit of the introduction of much of the same evidence to support the respective charges, great care should be taken to protect the interest of the state and the rights of the defendant against any prejudice that might have arisen from the former trial, and ordinarily both cases would not be tried at the same session of the court. Under our former decisions there has been no technical violation of the law in that regard, and yet it may well be doubted whether the results of the second trial may not have been in some degree influenced by the transactions in the former trial. Under such circumstances, if there were a sufficient number of trials in succession at the same session of court, the acquittal of an innocent defendant in all of the trials might not be as certain as the public interest requires.

Evidence that the various houses of prostitution were open and being operated during the time named in the indictment was competent, but apparently the cross-examination of the witness McLimans who testified to these facts was somewhat too restricted. This perhaps was owtions were propounded to this witness upon this cross-exing to the fact that so many apparently unnecessary quesamination.

There seems to have been some attempt made to show that there was a conspiracy among the keepers of these houses and their patrons to prosecute this defendant unjustly. So many of the witnesses were connected with these houses that this would have been an important matter if it had been established by the defendant. Many questions were asked by defendant's attorney in the cross-examination of the plaintiff's witnesses with this object in view, and there are many assignments of error in the brief predicated upon sustaining objections to these questions. Many questions and answers were allowed that might have been excluded, and it seems probable that in some instances evidence was excluded that might have been allowed. This was almost unavoidable under the circumstances. In many cases the purpose of the question was not as plain to the court as it may have been to counsel. As the case may be tried again we have gone somewhat into detail, but we cannot attempt an analysis of this evidence, covering as it does more than 600 sheets of closely typewritten matter.

The witness Nannie Meyers testified to a conversation with the defendant at the defendant's office in which the defendant said she could have no police protection in running her house, the only protection she could have was what he, the defendant, could give, and asked her what that would be worth to her. She was then asked whether she heard from him after that, and testified that the witness Riley McLimans called at her house, and, representing that he was sent there by the defendant, asked her if she was going to send that money to the defendant. She was

Koenigstein v. State.

then asked, "What did you say?" This was objected to
as incompetent and hearsay. The court overruled the ob-
jection, and she answered, "I said, 'Yes,' but I didn't have
it, and I asked him if it would be all right in a few days,
and he said he didn't know, but he would see. Q. Was
anything said about whether the other women had paid?
A. I asked him if the other women had paid, and he said,
'Yes.' " It is insisted that this evidence was incompetent
and prejudicial. There was, however, evidence that the
defendant himself had represented to this witness and oth-
ers that McLimans would receive this money for him, and
although this was denied by the defendant, still if the jury
believed that McLimans was authorized to receive the
money for the defendant this evidence would not be pre-
judicially erroneous so as to require a reversal.

There are many assignments of error upon the rulings
of the trial court in admitting and excluding evidence. In
some instances the trial court might properly have been
more liberal in the cross-examination of the state's wit-
nesses, and also in the defendant's offer of evidence.

Instruction No. 3, given by the court, appears to be
rather more particular to guard the interests of the state
than those of the defendant against mistakes or oversight
by the jury. Great care should be taken in such instruc-
tions to avoid the impression that the state is more in-
terested in conviction than in acquittal. "It is essential to
the peace and welfare of society and good government that
every guilty man be punished, when his guilt is established
by a measure of proof required to convict of crime in a
court of justice. * * * You should not allow your
minds to be influenced by consideration of sympathy for
the defendant, or for his family or friends." This instruc-
tion presents pretty strongly the interest of the state in
conviction. The corresponding statement, "You will read-
ily appreciate its importance to the defendant, because it
involves his liberty," perhaps infers that the state is equal-
ly interested in the acquittal of an innocent man, but does
not present that idea as emphatically. Under the circum-
101 Neb.—16

stances in this case this instruction was prejudicial to de-defendant.

One of the grounds for the motion for new trial was that there was misconduct of one of the jurors in the jury room while the jury was considering their verdict. Three several jurors testified that the juror Yeazel stated in the jury room to the jurors, in substance, that he had known the defendant since boyhood, and that he knew his reputation, and that it was bad, and stated some things as facts to the jury which, if true, would indicate that the defendant's character and reputation was bad, and that the said Yeazel continued in this sort of recital to the jury until he was stopped by the foreman of the jury. This evidence of these three witnesses was denied by the juror Yeazel, and also denied by one other juror, who testified that the juror Yeazel did state that he knew the defendant when he was a boy, but that he did not state the other matters attributed to him. This witness stated that cots were put up for them, and that during the night he went to sleep and slept until 7 o'clock the next morning. He was asked if it was possible that Yeazel might have made the remarks attributed to him by the other jurors, and answered, "It is possible, I presume, but not probable. * * * I couldn't say I heard every word because we were all talking a good deal. Q. And at times some were talking in one part of the room and others in the other part? A. Yes, they was talking to some extent." The foreman of the jury was not called as a witness. Such a recital of alleged facts as it is charged this juror made would be misconduct and would vitiate the verdict. The preponderance of the evidence is that the juror Yeazel was hostile to the defendant, and that he stated as facts within his knowledge substantially the matters testified to by the three jurors referred to.

For the reasons indicated, we cannot affirm the judgment, and it is therefore reversed and the cause remanded for further proceedings.

REVERSED.

LETTON and ROSE, JJ., dissent.