## NOLAN *v.* STATE

[No. 155, October Term, 1956.]

*Decided May 9, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Herbert Myerberg,* with whom was *M. William Adelson* on the brief, for appellant.

*Alexander Harvey, II, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Alger Y. Barbee, State's Attorney for Montgomery County,* and *Leonard T. Kardy, Deputy State's Attorney,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

The defendant, appellant, John S. Nolan, and Mrs. Mary V. Biggs were jointly indicted on November 24, 1953, in an indictment containing two counts. The first count charged them jointly with statutory Embezzlement, and the second count with Larceny After Trust. The second count was abandoned during the trial of Nolan. From a judgment and sentence on a verdict of a jury finding Nolan guilty of embezzlement of $2,592.94 from Federal Discount Corporation, Inc., (Federal), he appeals.

Mr. Benjamin W. Abrams, President of Federal, testified in part as follows. Nolan was originally hired by Federal in September, 1951, when its offices were located in Washington, D. C. By contract he was guaranteed $10,000.00 per year. When his contract ran out his salary was reduced to $125.00 per week. In Washington, Federal bought up conditional contracts of sale from automobile dealers. In August, 1952, its offices were moved to Silver Spring where it qualified under the Maryland law in order to do a small loan business. Although Mr. Abrams did not work in the office he visited there frequently. Defendant was manager of the office where there were two other employees, Joseph C. Lauer and Mrs. Mary V. Biggs. Nolan, as manager, was responsible for everything that went on in the office. He opened all the mail, looked at the money and checks, passed on loans, and received payments in the office. He was the only one of the three employees who was bonded. Lauer collected delinquent accounts. He was the outside man. On the recommendation of Nolan, Mrs. Biggs was employed. The figures were compiled by Nolan and Mrs. Biggs. Her duties were primarily that of cashier. She also entered the payments, made out daily report sheets and balanced out those sheets. Copies went to him, the accountant, and one copy remained in the office. He had seen Nolan and Mrs. Biggs working together on these sheets. After Federal made a loan it would be discounted with various banks. The note would be sent to a bank and Federal would immediately receive seventy percent of the amount of the note. The balance would be paid as the customers made their payments. In Federal's office at the end of the day the various payments made by the customers would be separated, part to be deposited the next day in Federal's bank account, and part to be sent to the bank which had discounted the notes. Mrs. Biggs would count up the receipts and compare them with the cash or checks she had in the cash drawer. After the payments had been separated and verified, the cash drawer, provided by Federal, containing the separated payments and receipts would be placed in Federal's safe and the safe locked. The next morning Federal's bank deposits would be removed from the safe

and deposited in the bank. Nolan quit his job on November 2, 1952, when he was instructed not to take business from an automobile dealer named Metcalf. Mrs. Biggs quit the same day. Mr. David Gruber, an accountant, was called in to audit the books the same day. As a result the shortages were discovered.

The principal witness for the State was Mrs. Biggs, who had been employed by Federal in October, 1951, when the office was in Washington. She had been promised immunity by the State if she would testify against Nolan. She said that from October 20, 1952, through October 31, 1952, the dates charged in the indictment, and also at other times, Nolan, the manager and supervisor of the office, wrote receipts and received money from customers who had borrowed from Federal. She received some of the collections, as did Mr. Lauer, Mr. Abrams, the President, and Mr. Wolk, the Vice-President, when they were in the office. Also, quite a number of payments came through the mail which Nolan opened. He would match the payments with the account cards, write receipts and put these in a compartment in the cash drawer. She prepared the daily report sheets which showed the collections during the day. Nolan would check these. She was not the cashier but merely a clerk. The sheets were made up from the account cards and the receipt of cash and checks. An hour before closing time every afternoon she balanced out the cash drawer. She would then run a tape on the adding machine to verify that every receipt had been posted. From that she would subtract any checks or money orders in the cash drawer, and the difference between those two figures would give the amount of cash which would go in the deposits to balance out each day. The sheets were not made up until the following day when she would take them to Nolan to check and would give him a recap of the collections. While in the office in Washington in December, 1951, Nolan decided that he wanted two watches, one for her and one for himself. He did not have the money to get these and finally he thought of manipulating Federal's accounts. His scheme was that after she had balanced her cash drawer he would go over the sheets with her. He would tell

her to take out of the cash an odd amount, such as $251.24, an amount that could not be checked back through the receipts to pinpoint specific accounts. Under his instructions she would then rerun the tape to show the short additions so, when the daily report sheets were prepared, she would show a total which would not agree with the total amount actually received or the correct total of the items shown on the sheets, but only the amount that would go into the bank account. The cash that was not deposited in the bank would be taken by Nolan and put in his pocket. This cash would be taken out of the deposits after the cash drawer was balanced. The deposits for each day were thus short totaled. More money was collected than was put in the bank on those days. She was very reluctant to cooperate with Nolan in this manipulation. She knew it was not right and that it was not "fool proof". Nolan took the money and bought the watches. When the company moved to Silver Spring the same manipulation of the accounts was followed under Nolan's directions. She and Nolan had been going together since early in 1951. He told her he was separated from his wife but she would not give him a divorce. He took her to various restaurants around Washington. They went to the Silver Fox Restaurant an average of four times a week, where they had drinks and dinner. During the period from August, 1952, to October, 1952, he paid that restaurant various amounts, about $225.00 each payment. She did not take any of Federal's money. He would keep part of the money which he took from Federal's cash drawer, would give part to her and, if anything was left, it was kept in the top drawer of a desk in her apartment. She bought some clothes with her money. In October, 1952, she thought there was between $25,000.00 and $30,000.00 in that desk drawer. Part of this money was taken from Federal and the balance from a deal which Nolan had with a used car dealer, Metcalf, who was giving him a "kick back" for loans made by Federal. Nolan later took the money from her desk drawer and told her he had buried it in the basement of his home. She purchased a 1951 Cadillac for herself in February, 1952, for about $3,000.00 with money Nolan gave her and which he took from Federal. She

bought another Cadillac in September, 1952, in Philadelphia, in the presence of Nolan, for about $5,300.00 in cash, which Nolan paid for. The certificate of title was made out to her and later put in their joint names. In the summer of 1953 Nolan said he wanted the title transferred for the purpose of obtaining a loan. About that time he gave her $4,200.00 to deposit in her checking account because he said he had a joint account with his wife and she might check on it. $4,000.00 of this amount was later drawn out of the bank and $200.00 left to cover other expenses. She also purchased a mink coat in Washington for $5,500.00, plus tax. Part of this was paid for by turning in another mink coat. She paid the balance on it about the first of October, 1952, with money Nolan had given her. In July, 1953, she turned the coat over to him to sell in order to provide her with an attorney when she was arrested in Washington. He still has the coat in his possession. About November 1, 1952, Mr. Abrams discharged Mr. Lauer and said that she and Nolan would have to do the work, which the three of them had not been able to do. Nolan became angry and left. Shortly after she also left. Nolan was under the impression that their scheme would never be found out and that an auditor would not find the short additions. He later, however, changed his mind. He received a call to report to Federal to discuss certain discrepancies which the accountant had found. He did not want to go and an attorney in Washington advised him not to go. At that time Nolan told her she was as guilty as he because she had prepared the daily report sheets. He threatened her, if she ever testified against him. She was acquitted by a jury in Washington. She stopped going with him in May, 1955, when she was informed that he was living with his wife.

Mr. David M. Gruber testified that he was a certified public accountant and was employed by Federal on November 9, 1952, to do accounting and auditing work. The daily report sheets showed different totals on the two sides and from his analysis of those sheets there was a difference of $2,592.94 which did not go to Federal's credit. He talked to Nolan about the shortages once and he denied any knowledge of it.

He spoke to Mrs. Biggs at the same time and she admitted that she had typed up the sheets. At the first meeting she did not admit that she had short-added the sheets. At another meeting she did admit the short-adding and putting on the figures. She did not admit that she had exclusive control of the sheets. He thought the attorney for one of the former officers of Federal asked Nolan and Mrs. Biggs to come to his office. They appeared voluntarily.

John S. Nolan testified that he was supposed to be the manager of the office but did not have much authority. Federal had moved to Maryland in order to get in the small loan business. His position was to build up accounts, get new ones, and to entertain dealers. Three-quarters of his time was spent out of the office. Mr. Abrams and Mr. Wolk made all the decisions. Mr. Abrams came in the office every day on his way to work. Mr. Wolk spent most of his time there. The office managed itself. Each of the three officers received $200.00 per week as salary, he received $200.00 per week, Mr. Lauer $100.00 per week, and Mrs. Biggs $75.00 per week. He did not know anything about the scheme testified to by Mrs. Biggs, by which money was taken from Federal, and did not know what was going on until the day he was arraigned in the District of Columbia. He insisted that he should open the mail because that was the best way to know what was going on. The mail would be put on his desk each morning. He would open the envelopes, read the letters, put the letters and any payments back in the envelopes and hand these to Mrs. Biggs, who was hired as cashier and who took payments from customers and made up the daily report sheets. She would write the payments up on the machine, post these on the ledger cards, and put these in the cash drawer. The receipt writing cash register rested on top of the cash drawer which was 18″ x 2′, and with a lock at the top. Mrs. Biggs would lock it and put it in the safe. Lauer was supposed to settle with Mrs. Biggs daily but would only do it weekly, when he would turn over the money to her to be deposited in the bank. The only thing Nolan ever looked at on the daily report sheets were the new loans. He did not know how to read, or make up, these sheets and did

not sign these and was never required to do so. Mrs. Biggs took all the payments. It was not part of his duty to collect payments. All the collections in the office were made by Mrs. Biggs and Lauer. He did not have access to Federal's money because Mrs. Biggs had a key to her drawer and Lauer had a key to his. He had none. He denied that he ever took any money or gave Mrs. Biggs any money that belonged to Federal. He admitted that he took special commissions from automobile dealers for obtaining loans. He called this the "Metcalf operation" and said he paid income taxes on $9,000.00 received from those commissions. Mrs. Biggs actually handled the mechanics of the Metcalf "kick back" as she was cashier and that is the reason he split his commissions with her. The reason Mrs. Biggs in her testimony denied getting these commissions was because she did not pay income taxes on these. He did not pay any of these commissions to Federal because it was against the small loan laws of Maryland. In order to have found out that Mrs. Biggs was short-adding the daily report sheets it would have been necessary for him to have run an adding machine tape of the total on each sheet. He did not do this. He did not check any of the adding machine tapes at the end of the day, or any of the tapes on the collections to see whether the accounts were short. He admitted that he had been "very foolishly indiscreet" with Mrs. Biggs. He took her to the Silver Fox Restaurant for dinner on various occasions. At the time he was going out frequently with Mrs. Biggs to cocktail lounges and for dinner, he was living with his wife. He visited Mrs. Biggs' apartment on occasions. He did not think she had a desk in her apartment and he did not leave any money with her in her apartment. He never had any conversation with her about concealing money at any place. When they went to Philadelphia to buy the Cadillac Mrs. Biggs paid cash for it. He asked her where she got the money and she said it came from her share of the "Metcalf operation". The reason she transferred the title to him was because she had a large suit pending against her in the District of Columbia, and she was afraid someone might attach the automobile. The first time he saw the mink coat was in

the fall of 1952. He asked her where she got it and she said she traded in another coat for it, and did not have to pay much cash. She was buying it on the installment plan. The reason he finally got possession of the coat was because he had advanced money to her for her attorneys in the District of Columbia. After they were arrested she told him she paid the difference on the two coats with money she had stolen from Federal. When asked whether he had any conversation with her about the $4,000.00 she had withdrawn on November 14th, he replied that she said she had gotten the money from the "Metcalf operation". The first time he learned Federal was in bad financial condition was when Mrs. Biggs told him. She kept the checkbook, kept it posted, and knew how much money Federal had in bank. At one time the account was overdrawn about $20,000.00. He thought this was because the officers were taking all the money out of the company in salaries. He did not discover that the amounts shown on the daily report sheets were short until he was arrested in the District of Columbia. He paid $13,000.00 in defense of his case. When asked whether it did not seem strange to him, or arouse his curiosity as to how Mrs. Biggs, working on her salary at Federal, could buy mink coats and Cadillacs, he said she told him an uncle had died and left her a large sum of money. However, at a later date she told him the sum was only a few hundred dollars. He resigned from Federal on November 2, 1952, when he was told by Mr. Abrams that Mr. Lauer was to be laid off, and he and Mrs. Biggs would have to do additional work. His salary was reduced from $187.00 net to $112.00 net on September 12, 1952. Six months after he left Federal he was told by the accountant of the shortages. The first time he talked to Mrs. Biggs about the shortages was when he was arrested in the District of Columbia for embezzlement. Mrs. Biggs then admitted to him that she took the money and explained how she had short-added the daily report sheets. He had been going with her for a year and a half at the time they left Federal and continued to go with her about two years afterwards up to the end of May, 1955. She told him she had become interested in her new employer and did not want to

see him, again. He admitted that he had seen Mr. Lauer by appointment in the Robinhood Restaurant the night before he testified in court. On rebuttal examination Nolan said he directed his lawyer to issue a summons for Lauer. Lauer called him and was told that he was not going into Maryland. Lauer was asked to come to Maryland to testify and he refused. After some further conversation they agreed to meet at the Robinhood Restaurant. At that time he asked Lauer to come to Maryland to testify and Lauer refused stating that he and his boy had been threatened that afternoon by Officer Roberts, of the Metropolitan Police Force, who said he could make things tough for him if he did not come to Maryland to testify for the State. He never asked Lauer to testify to something that was not true. When he asked him to testify as to who took payments in the office he replied that he did not want to do so.

Mr. Norman W. Shilby testified that he saw Nolan the night before the trial below in Nolan's girl friend's apartment. From there he, Nolan and the girl friend went to the Robinhood Restaurant. Lauer had been called on the telephone and asked to come to Maryland for the purpose of testifying. Twenty-five minutes later he came in. Shilby was a disinterested party, a cab driver, whom they were using to transport Lauer over the State line of Maryland to testify. There was some conversation about collections as far as the finance business was concerned. Nolan said to Lauer: "Would you come and testify to the fact that I didn't take any collections during the time I was in the Maryland office?" Lauer replied to this: "Well, I couldn't testify to that because it isn't true and that you did take collections in the Maryland office." Then Nolan said: "Well, you can tell a little white lie for me, come on out here and testify for me in my behalf, I need you boy. If I don't get you out here to Maryland I am going to jail."

Mr. Lauer testified that he had been collection manager for Federal in Silver Spring from August, 1952, to December, 1952. When he collected on delinquent accounts he turned the money over to Mrs. Biggs, the cashier. At no time did

he bring any money in the office and give it to Nolan. When asked by Nolan to testify that he had not taken any collections, he said: "I told him all I could tell was the truth, all that I knew was that I didn't know whether he had taken them or hadn't taken them." Nolan then told him that if he did not testify he was "sunk". He does not recall any remark about telling a white lie.

Appellant contends that there was not sufficient evidence in the case to corroborate the testimony of the accomplice, Mrs. Biggs, as to his participation in or connection with the offense charged. As stated in *Luery v. State,* 116 Md. 284, 294, 81 A. 681, 685, decided June 23, 1911, too much in the way of corroboration should not be required. It is not necessary to have sufficient evidence to convict exclusive of the testimony of the accomplice. If that were required, there would be little use in having the accomplice's testimony. The important matter is to have the accomplice supported in at least some of the material points involved tending to show the guilt of the accused. *Polansky v. State,* 205 Md. 362, 368, 109 A. 2d 52. The corroborating evidence may be circumstantial and may consist of contradictory statements made by the accused, or untruthful statements made by him in respect to matters connected with the commission of the crime. 2 *Wharton's Criminal Evidence,* 12th Ed., Sections 462, 463. We are of opinion that the following evidence was sufficient to corroborate Mrs. Biggs' testimony. Appellant, as manager of Federal's office, had complete control and supervision there. During the time he was manager large losses in Federal's accounts occurred. Collections were received by him. Mr. Abrams testified that he saw the appellant working up the daily report sheets with Mrs. Biggs. Appellant admitted that he saw the daily report sheets. Appellant was on intimate terms with Mrs. Biggs during the period that the losses occurred. She had been hired on his recommendation. He knew she had large sums of money to purchase Cadillac automobiles and mink coats, and that her salary was $75.00 per week. Appellant, himself, spent large sums of money and apparently had large sums available. Appellant feared that he would go to jail, if Lauer did not testify that appellant had

not received any collections. *Hurwitz v. State,* 200 Md. 578, 92 A. 2d 575.

Appellant further contends that the trial judge erred in admitting into evidence State's Exhibits 2, 3, 4, and 5. These were some of the daily report sheets during the period September 8, 1952, to October 31, 1952. As above set forth Mrs. Biggs testified that the daily report sheets were made up under the direction of appellant. Mr. Abrams said he had seen Nolan and Mrs. Biggs working on the daily report sheets. Appellant was the manager of the office and responsible for what happened there. There was also testimony that Nolan made collections. These were made in the regular course of Federal's business. Code, 1951, Article 35, Section 68. Although Nolan was not charged with shortages from all of these particular sheets, there was testimony that the same method as to shortages was followed on the sheets by which the money Nolan is here charged with embezzling was obtained. There was reasonable probability of connection with the crime alleged and, therefore, these sheets were admissible. *Watson v. State,* 208 Md. 210, 216, 117 A. 2d 549, and cases there cited.

Appellant further contends that the trial court erred in refusing to allow him to offer evidence of his acquittal on the charge of embezzlement from Federal in the United States District Court for the District of Columbia. As part of the necessary proof in the case the State brought out the fact that the plan by which the money was taken originated in the District of Columbia and that both Mrs. Biggs and Nolan were arrested and charged with that crime in the District of Columbia. Mrs. Biggs, in the trial of the case in Maryland, testified that she was acquitted by a jury. When asked whether Nolan was acquitted, she replied: "On a directed verdict." Objection was made to her last statement. The trial judge sustained the objection and told the jury to disregard the testimony of Mrs. Biggs concerning the acquittal in the District of Columbia. When the accused was asked whether he had ever been convicted of a crime, he replied that he had never been arrested for a crime except in the District of Columbia about three years before when he was tried for embezzling

money. The trial judge instructed the appellant to answer yes or no. He replied: "I have not been convicted, no." The fact that he had not been convicted did not necessarily mean that he had been acquitted. The trial of the case might not have been concluded. The appellant then endeavored to offer in evidence the certified copy of the record in the District of Columbia to show that he was acquitted in that case. He was not allowed to present this evidence. Although that copy of the record may not have complied with the requirements of U.S.C.A., Title 28, Sec. 1738, no objection was made on that ground. Where the State has offered evidence to show the defendant's general plan or scheme by virtue of which the crime charged was committed, whether it was of similar offenses or otherwise, the defendant should be allowed to prove his acquittal in the former trial. *Koenigstein v. State,* 101 Neb. 229, 162 N. W. 879; *People v. Stutsman,* 66 Cal. App. 134, 225 P. 477; *Johnson v. Com.,* 217 Ky. 565, 290 S. W. 325. It was admissible, however, for no other purpose than for the purpose of affecting the weight of the evidence against the accused. *Bell, alias Kimball v. State,* 57 Md. 108. The trial judge was in error in rejecting such evidence, and the rejection would be grounds for a new trial.

The appellant further contends that, even assuming there was adequate corroboration of Mrs. Biggs' testimony, the evidence produced made the crime larceny and not embezzlement, as charged in the indictment.

Article 27, Section 154, *supra,* under which the appellant was indicted, provides in part:

"Whosoever being a cashier, servant, agent, or clerk to any person, or whosoever being a cashier, servant, agent, officer, or clerk to any body corporate, or being employed for the purpose or in the capacity of a cashier, servant, agent, officer or clerk, by any person or body corporate shall fraudulently embezzle any money, * * * which, or any part whereof, shall be delivered to or received, or taken into possession by him, for or in the name or on account of his master or employer, shall be deemed

to have feloniously stolen the same from his master or employer, although such money, * * * was not received into the possession of such master or employer, otherwise than by the actual possession of his cashier, servant, agent, officer, clerk or other person so employed, * * *."

In *State v. Tracey,* 73 Md. 447, 448, 450, 21 A. 366, in referring to this statute, this Court said: "This statute was enacted by chapter 310 of the Acts of the General Assembly of 1886. It is borrowed almost *verbatim,* from 39 George III, chapter 85, and 7 and 8 George IV, chapter 29, sec. 47. [39 Geo. III, Ch. 85, 1799, 7 and 8 Geo. IV, Ch. 29, Sec. 47, 1827]. * * * Having borrowed the law from England where an established construction prevails and has long obtained, it is reasonable to hold, that we have adopted it with the interpretation there accorded to it." The appellee contends that, because the English statute did not contain the words "delivered to him", which is in the Maryland statute above quoted, the English cases interpreting the English statute are not applicable here. However, we cannot see the force of this argument as money delivered is money received and the English statute contains the word "received".

In *Reg. v. Wright,* Dears & B. Crown Cas. 431, 441, 442 (1858), the defendant had been indicted for larceny and contended that the offense, if any, was embezzlement which is the converse of the case before us here. There, the defendant was employed by a bank to open and conduct a branch office in another town. The office provided by the defendant was in his own home where he also carried on other business. The expenses of opening and maintaining this branch office were paid by the bank. It was the duty of the defendant to place money received by him during the day in an office safe provided by his employer. There were duplicate keys to the safe and the bank had possession of one of these. Defendant received money, paid checks and furnished the bank's manager at the main office a weekly report showing money received and paid out and the balance on hand. When an auditor was sent to check the records defendant admitted that the accounts

were about 3,000 pounds short. He handed over all the cash he had left, which he took from a drawer in the counter of the office. The evidence did not show directly whether the defendant appropriated the money from receipts before or after he put it in the safe. He was indicted for larceny on the theory that the money received by him would have been put in the safe at night, and, when put there, it came into the bank's possession and, further, because the weekly reports submitted by the defendant amounted to a statement that he held the balance for the bank as the bank's money. The Crown contended that, although defendant had the custodial care of the money, it was in the constructive possession of the bank from the time the defendant placed it in the office safe. In sustaining the conviction of larceny, Lord Campbell, C. J., said: "When the money was placed in that safe, which was furnished by the employer, and of which the employer had a duplicate key, *the exclusive possession of the prisoner was determined.* The money being so deposited in the safe and afterwards taken out of the safe by the prisoner *animo furandi,* he was guilty of larceny. The safe in this case very much resembles a till in a shop. The shopman has access to the till, and has a right to take money out of it for lawful purposes, but if he takes it out *animo furandi* he is a thief." (Italics supplied). Judge Crowder added: "The fact that the prisoner had the entire control over the premises makes no difference. If he took the money from the safe for the purposes of the bank, he did so as part of his duty; but if he took it for his own purposes he was guilty of larceny." For other authorities reaching the same conclusion as the *Wright* case, *supra*, see *Rex v. Hayward,* 1 Carr & Ker. 518 (1844) ; *Reg. v. Reed,* 6 Cox, C.C., 284, 289 (1854) ; 10 *Halsbury's Laws of England,* 3rd Ed., pg. 787; *Aabel v. State,* 86 Neb. 711, 126 N. W. 316; *Walker v. Com.,* 8 Leigh 743 (Va., 1837) ; *Clark & Marshall Crimes,* Fifth Ed., Kearney, Sec. 345; *Hochheimer,* Second Ed., Sec. 367. If a servant takes goods out of the master's possession, the crime is larceny, but if he takes goods before these reach his master's possession, the crime is embezzlement. *2 Russell on Crimes,* 10th Ed., Vol. 2, pg. 1044. *Stansbury v. Luttrell,* 152 Md.

553, 137 A. 339, is a case in which an action for malicious prosecution was brought against Stansbury and others for having charged the appellee with larceny of three trees. The mere cutting or removing of the trees without either the consent in writing of the owners of the land was made a misdemeanor by Section 525 of Article 27 of the then Code. The trees were cut down on Friday and Saturday and all the logs were not carried away until the afternoon of the last day. It was there pointed out by Judge Parke that the trespasser relinquished possession of some of the trees by leaving them on the land and the owners acquired constructive, if not actual, possession of the logs in their new character of personalty and the nature of the trespass and his carrying away of the logs with the necessary felonious intent, would have been larceny according to the modern authorities. For cases which have retained the distinction between larceny and embezzlement in accordance with the English decisions see *Weldon v. State,* 17 Ala. App. 68, 81 So. 846; *Tredwell v. United States,* 266 F. 350 (4th C. C. A., 1920); *Weisberg v. United States,* 258 F. 284 (App. D. C., 1919); *Hatcher v. State,* 74 Fla. 112, 76 So. 694; *Warmoth v. Com.,* 81 Ky. 133 (1883). It is stated in 2 *Wharton's Criminal Law,* 12th Ed., pgs. 1589, 1590, that, if the case is larceny at common law because the money was taken from the prosecutor's possession, the charge for embezzlement fails. The embezzlement statutes were passed, not to cover any cause within the common law range of larceny, but to cover new cases outside of that range. If the goods were taken from the owner's possession, the crime is larceny, not embezzlement. Goods which have reached their destination are constructively in the owner's possession although he may not yet have touched them and, hence, after such termination of transit, the servant who converts them is guilty of larceny, not of embezzlement. It is there stated at page 1591: "No inconvenience can arise from the maintenance of this distinction, since it is allowable *as well as prudent* to join a count for larceny to that for embezzlement. But great inconvenience would follow from the acceptance of the principle that the embezzlement statutes absorb all cases of larceny by

servants." (Italics supplied). See also 146 *A. L. R.* 532, et seq.

The appellee relies on the English cases of *Rex v. Bazeley,* 2 Leach C.C. 835 (1799); *Rex v. Bull,* 2 Leach C.C. 841 (1797); and *Rex v. Waite,* 1 Leach C. C. 28 (1743). These cases, however, were decided before the English embezzlement statute was enacted and apparently the statute was enacted as a result of those decisions. The appellee also relies on the case of *State v. Taberner,* 14 R. I. 272, 51 Am. Rep. 382 (1883). However, the Rhode Island statute is much broader than the Maryland statute. Of course, the embezzlement statutes in the various states are not uniform. In *Commonwealth v. Ryan,* 155 Mass. 523, 30 N. E. 364, 15 L. R. A. 317 (1892), relied on by the appellee, where a conviction for embezzlement was upheld, it was stated that the mere dropping and immediate removal by a clerk, of the money in the till did not divest the clerk of possession and place possession in the employer. In *Weldon v. State, supra,* relied on by the appellee, in which a conviction for embezzlement was sustained, the receptacle in which the receipts were placed and from which they were later withdrawn, was one provided by the defendant, himself, for his own convenience, and not furnished by the employer as a regular depository. The Court there said that, if the cash drawer had been provided by the employer for the deposit of its funds, the offense would have been larceny. In *Morgan v. Commonwealth,* 242 Ky. 713, 47 S. W. 2d 543, relied on by the appellee, the office manager, who was the only person who knew the combination of the safe, was held to be guilty of embezzlement, not larceny. In *Ker v. People,* 110 Ill. 627 (1884), relied on by the appellee, where the appellant was convicted of embezzlement, the court pointed out that the Illinois statute was much more comprehensive than the English statutes and, therefore, the English decisions were not helpful. The appellee also relies on a quotation from *Bishop on Criminal Law,* 9th Ed., Vol. 2, Sec. 328, to the effect that, if there had been no previous prosecution for larceny, even if the taking of the embezzled articles amounted to common law larceny, the embezzlement indictment should be sustained. However, that quotation is apparently

founded on *State v. Taberner, supra,* and, as pointed out above, the Rhode Island statute is much broader than the one before us here.

From the testimony offered by the State, Federal had provided a cash drawer in which the money was deposited as received. Mr. Abrams and Mr. Wolk, officers of the company, also accepted payments and had access to the money drawer in which all the money was placed. The money was not taken by Mr. Nolan until it had been placed in the cash drawer and balanced at the end of the day. When taken by appellant, as alleged, the cash was in the possession of Federal. We must therefore conclude that under the authorities cited and under the testimony in this case there was not sufficient evidence to find the defendant guilty of embezzlement. The case will be remanded for further proceedings in order that the State, if it deems proper, may try the defendant on an indictment for embezzlement and larceny, if such an indictment is returned against the defendant. *Wright v. State,* 198 Md. 163, 173, 81 A. 2d 602; *State v. Lamoreaux,* 20 N. J. Super. 65, 89 A. 2d 469, 474; *State v. Persons* (Vt.), 96 A. 2d 818, 820; 22 *C. J. S., Criminal Law,* Sections 272, 273, 274.

> *Case remanded for further proceedings.*
> *Costs of this appeal to be paid by the*
> *county council of Montgomery County.*

PRESCOTT, J., filed the following concurring opinion:

It is unfortunate not to be able to concur fully in such an able and carefully prepared opinion as that filed by a majority of this Court. However, as it seems to me that it reestablishes many of the tenuous niceties between larceny and embezzlement with which the early English cases are replete, and that it unnecessarily will embarrass many future prosecutions although the accused palpably may be guilty, I have decided to state the reasons that prevent my complete concurrence.

The facts are quite fully covered in the majority opinion, so, they will not be repeated. The holding is, that a manager of an office, who has complete charge of its operation and who

is "responsible for everything that went on there" is not guilty of embezzlement because the money received by himself and two other employees was first placed in the drawers of a cash register in the small office that he managed before he fraudulently converted it to his own use. It is conceded that had he taken it before it went into the drawers, his crime would constitute embezzlement; but the ruling of the Court is, that as the money went into the drawers (although under his complete custody and control) it went into the constructive possession of the owner and its taking thereafter constituted larceny and not embezzlement.

Embezzlement as a crime was unknown to the common law. At that time, its closest kin was larceny; but, larceny had two defects by means of which many persons, who unlawfully appropriated another's goods escaped criminal prosecutions, although the moral turpitude of the offense was as great as in the case of larceny proper. The first of these gaps was constituted by the position, that to maintain larceny, the stolen goods must at some time have been in the owner's possession; and, the second resulted from the assumption, that when the possession of goods was acquired in a *bona fide* manner by a bailee no subsequent fraudulent conversion (unless there be a breaking of the bulk, etc.) could be larceny while the bailment lasted. *Wharton's Criminal Law*, (12th Ed.), par. 1258. As a result of these gaps, the early English decisions made hair-splitting distinctions by very subtle reasoning between "custody", "possession" and "constructive possession" in an attempt to prevent the guilty from escaping justice.[1] Mr. Justice Stephen, in his history of the criminal law of England says of these decisions: "They turn upon discussions as to the nature of possession, which are as technical and unsatisfactory as all attempts to affix a precise meaning

---

1. For the sake of brevity, I shall not state the facts of these cases. Anyone who may desire to pursue the matter further will find a very complete discussion of this entire matter in a note in 98 *Am. Dec.* ps. 126 to 174. See also 32 *Am. Jur., Larceny*, par. 56; 146 *A. L. R.* 532. For the modern law of England relating to embezzlement, see 9 *Halsbury's Laws of England, Criminal Law and Procedure*, pars. 889-897.

to a word which has no precise meaning must be". It seems not unlikely that some of these decisions may have later inspired the famous statement of Mr. Bumble, although it was made concerning another branch of the law: "If the law supposes that * * * the law is a ass, a idiot". *Oliver Twist*, Ch. 51, by Charles Dickens. But these decisions were made in an honest endeavor to cover the loopholes in the law and bring the guilty to justice.

This being the unfortunate state of the law, a remedy was sought. It is surprising to some authors that it was not until the year 1799 when what generally is considered the first embezzlement statute (39 Geo. III, c. 85) was enacted in England. It has served as a model for similar statutes in this country, although many of the States have markedly different provisions; and it has long since been superseded by subsequent embezzlement statutes of modified terminology. As a result, in order to determine the weight to give the out-of-State and English decisions, it is necessary to consult the statutes in force when the decisions were rendered. With this short background of the law of embezzlement, the case at bar will be considered.

It seems as though the present case properly can be decided by reference to our present statute on embezzlement alone, without the necessity of the citation of other authorities, although these authorities are ample and some will be cited later. Our statute, Art. 27, sec. 154 of the Maryland Code (1951), reads:

> "Whosoever being a * * * servant * * * shall fraudulently embezzle any money * * * which * * * shall be * * * taken into possession by him, for * * * his master or employer, shall be deemed to have feloniously stolen the same from his master or employer, although such money * * * was not received into the possession of such master * * * otherwise than by the actual possession of his * * * servant * * *."

A simple down-to-earth application of the facts presented in the record discloses that every element required in the stat-

ute is fully and completely covered. It is conceded that the nature of his employment is within the terms of the statute, and the evidence established to the satisfaction of the jury that the money was taken into his possession for and on behalf of his employer, and that he fraudulently appropriated it to his own use. The statute seems to require no more.

But the majority of the Court feel that the English decisions and other authorities (although apparently there is no Maryland case so ruling) require a holding that because the money went into the drawers before its fraudulent conversion, the offense was larceny and not embezzlement. If this be so, it seems to place the law in an unfortunate and somewhat indefensible position. When a man is in complete charge and control of an office and the law says to him: "If you steal your employer's money before it is placed in a drawer (under your charge and control) you are guilty of embezzlement, but, if you or someone under you places the money in that drawer (still under your charge and control) and then you steal it, you are guilty of larceny, and larceny alone", does it seem right? Could not it be said with just as much reason, logic and justification that if you steal money and place it in your left pocket, you are guilty of embezzlement, but, if you place it in your right pocket, you are guilty of larceny and larceny alone? Would it not be a sounder policy to follow the example of such cases as *Calkins v. State,* 18 Ohio State 366 or *Commonwealth v. Ryan,* 155 Mass. 523, 30 N. E. 364. In the *Calkins* case, the Ohio Court was requested to make a rather tenuous holding under its embezzlement statute as to whether or not certain property was "under (the) care" of the defendant, but the Court refused to do so, and said: "There is no more reason why courts should allow themselves to be misled by mere names and shadows in the administration of justice in criminal, than in civil cases." In the *Ryan* case, the facts were quite similar to those involved here. The defendant was an employee of a liquor store who received money from a customer, placed it in the money drawer of a cash register and a few minutes later he removed the money from the drawer and appropriated it to his own use. He was convicted of embezzlement and the same argu-

ment made in this case was made there, namely, that when the money went into the drawer it went into the constructive possession of the employer and, therefore, its taking constituted larceny but not embezzlement. Mr. Justice Holmes was then a member of the Supreme Judicial Court of Massachusetts and on behalf of the Court, he repudiated this contention and held the man was properly convicted of embezzlement. See also *State v. Taberner,* 14 R. I. 272; *Ker v. People,* 110 Ill. 627; *Morgan v. Commonwealth,* 242 Ky. 713, 47 S. W. 2d 543.

The apprehension that I have concerning the ruling in this case is aptly stated in *Komito v. State* (Ohio), 107 N. E. 762, where it is said:

> "Courts sometimes indulge in an *ethereal refinement* between larceny and embezzlement that in practical operation very often nullifies these statutes. The only benefit accruing from such a policy results in the rather doubtful advantage of the *criminal escaping his just punishment.*" (Emphasis supplied).

And Mr. Bishop, in his work on criminal law, very sensibly says:

> "Such, also, is the plain dictate of reason. Suppose, for instance, the taking of an article alleged to have been embezzled was such as amounts to a common-law larceny of it, why should not an indictment for this embezzlement be maintainable at the election of the prosecuting power as well as one for larceny, provided the act done was within the terms of the statute, and no previous prosecution had been had for it as larceny?"

*2 Bishop's Criminal Law,* Sec. 329.

Thus, we find ourselves in the peculiar position of following the subtle reasoning developed in the English decisions for the purpose of bringing the guilty to the bar of justice; but, in so doing, we directly come to their aid and comfort. Probably the solution of this rather difficult problem lies in the course followed by several of our sister States (and as was

done in England) where the legislative power has provided that under an indictment for larceny, or for larceny in one count and embezzlement in another, there may be a conviction of either offense.

As the trial Court, during a rather lengthy trial, fell into one error in ruling on the evidence, which is mentioned in the majority opinion, I concur in the result.