## WILLIAM M. LOKER, JR. *v.* STATE OF MARYLAND

[No. 169, Initial Term, 1967.]

4

*Decided September 1, 1967.*

The cause was argued before ANDERSON, ORTH, and THOMPSON, JJ., and CHILDS, J., Associate Judge of the Fifth Judicial Circuit, specially assigned, and TRAVERS, J., Associate Judge of the First Judicial Circuit, specially assigned.

*James E. Hogan,* with whom were *Arthur J. Hilland* and *Ferdinand J. Mack* on the brief, for appellant.

*Frank A. DeCosta, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Charles A. Norris, State's Attorney for St. Mary's County,* on the brief, for appellee.

ORTH, J., delivered the majority opinion of the Court. THOMPSON, J., dissents. Dissenting opinion by THOMPSON, J., at page 38 infra.

On May 24, 1966 the appellant was convicted by a jury in the Circuit Court for St. Mary's County, Judge W. Albert Menchine presiding, of the crimes of embezzlement and grand larceny. He was sentenced to imprisonment for a term of five years on each offense, the sentences to run concurrently.

A motion to dismiss the indictment against the appellant was filed by him and denied by the lower court after hearing and before trial of the general issue. Maryland Rule, 725. The appellant contends on this appeal that the court erred in denying the motion with respect to the ground therein alleged that "the Grand Jury which handed down said indictment was improperly, unlawfully and unconstitutionally selected, drawn and impaneled." This contention encompasses two issues:

I. The indicting Grand Jury was selected and impaneled unconstitutionally.

II. The indicting Grand Jury was selected in violation of statutory requirements.

## I

The legal basis for the contention that the Grand Jury was selected and empaneled unconstitutionally is predicated upon the decisions of the Court of Appeals in *Schowgurow v. State,* 240 Md. 121, decided October 11, 1965 and *State v. Madison,* 240 Md. 265. In *Schowgurow,* at page 131 the Court held that, under the decision of the Supreme Court in *Torcaso v. Watkins,* 367 U. S. 488, the provisions of the Maryland Constitution requiring demonstration of belief in God as qualification for service as a grand or petit juror were in violation of the Fourteenth Amendment to the federal constitution, and that any requirement of an oath as to such belief, or inquiry of prospective jurors, oral or written, as to whether they believe in a Supreme Being, was unconstitutional. The Court said, page 126:

> "Because of the requirement of the Maryland Constitution,[1] it has been the duty of nisi prius judges to make belief in God a condition to service as a juror. There is a strong presumption that judges and court clerks, like other public officers, properly perform their duties. [Citations omitted.] * * * Moreover this Court takes judicial notice of the fact that it is and for many years has been a widespread practice in this State, not only for grand and petit jurors to be questioned as to their belief in God as part of their oath, but also for prospective jurors to be so questioned, orally or in written interrogations, before their names are placed on the jury lists, and that any person who does not state his belief in God is excluded."

---

1. Article 36 of the Maryland Declaration of Rights provides, *inter alia,* that no person otherwise competent shall be deemed incompetent as a juror on account of his religious belief, "provided he believes in the existence of God, and that under his dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come."

It pointed out that the exclusion of non-believers was not only authorized but demanded by the Maryland Constitution and that the resulting danger of abuse obviates any need to show individual prejudice.

The factual basis for the contention was that evidence produced at the hearing showed that from a list of 150 persons selected by the Honorable Phillip H. Dorsey, Jr., Associate Judge of the Circuit Court of the Seventh Judicial Circuit of Maryland, prior to September 2, 1965, 23 persons were selected as the Grand Jury for the September term, 1965 and 25 persons as the petit jury panel. After the decision in *Schowgurow,* the Grand Jury so selected was discharged. From the 102 persons remaining on the original list a new Grand Jury was selected. It was this latter Grand Jury that returned the indictment against the appellant on November 4, 1965. The appellant argues that if the list of 150 persons was compiled in compliance with the then prevailing law of Maryland, it necessarily follows that a Grand Jury selected from that panel was unconstitutionally chosen. The evidence is clear, however, that in compiling this list no person was excluded because he did not believe in the existence of God. Judge Dorsey, called by the appellant, testified, and the record discloses no evidence to the contrary, that, in selecting the 150 persons, a question with respect to belief "in a Supreme Being" and "in moral accountability for [a person's] conduct" was "never asked of anyone." In answer to a question, "Did you have reference to it in your picking of these names?", he answered, "Since I have been judge, I have never known of anyone who's name was suggested for the jury, being a nonbeliever, nor has it ever been mentioned so-far-as I can recall." On cross-examination he was asked, "Is there any form that a person fills out or signs or anything or taken by any person to be eligible to get on the list of 150 names?" He replied, "No, sir, there is no form as far as I can recall. It has never been asked whether or not they believed in God, when the name was placed on the list of 150." A person was included in the list "without their knowing it." It appears obvious that the first Grand Jury was discharged because an oath reflecting a belief in a Supreme Being had actually been administered to its members before they commenced their du-

8

ties and not because the panel from which it was selected was unconstitutionally compiled. The "strong presumption" stated in *Schowgurow* that prospective jurors were questioned as to their belief in God, was rebutted by direct evidence in the instant case. In reiterating *Schowgurow* in *State v. Madison, supra,* the Court said, page 273:

> "* * * *once it is established that the method of the grand jury's selection is unconstitutional,* any accused indicted by such a jury has the right to have the indictment dismissed." (emphasis supplied)

The record is clear here that the indicting Grand Jury's selection with regard to the principles enunciated in *Schowgurow* was constitutional, and we so hold.

## II

By the laws of this State, the selection of jurors in St. Mary's County is accomplished in three steps: (1) the compiling of a list of prospective jurors; (2) the selection of a panel of jurors; (3) the drawing of jurors from the panel. In the words of the trial court, these laws are "a curious and somewhat abstruse mixture of general and local law," and it is necessary for us to determine what statutes governed at the time of the selection of the grand jury in the instant case. The public local law was enacted as Chapter 329 of the Acts of 1896, and has not been specifically amended since. It is codified in the Code of Public Local Laws of St. Mary's County, Everstine (1965), §§ 88, 89 and 90, [Art. 19 of the Code of Public Local Laws of Maryland, (Flack), 1930]. The relevant general laws are codified in The Annotated Code of the Public General Laws of Maryland, (1964 Replacement Volume), Art. 51, §§ 6, 9 and 10 (f). Code, Art. 1, § 13 provides that where the public general law and the public local law are in conflict, the public local law shall prevail; but if the language of a general law clearly indicates, either expressly or by necessary implication, a purpose to repeal a local law by adoption of the general law, the local law must yield to that intention. *Kirkwood v. Provident Savings Bank,* 205 Md. 48. However, repeals by implication are not favored, and local laws are not repealed by general laws, unless such purpose is clearly indicated. *Auto. Accep. Corp. v.*

*Univer. Corp.*, 216 Md. 344. If two legislative acts can reasonably be construed together so as to give effect to both, such a construction is to be preferred. *Montgomery County v. Bigelow,* 196 Md. 413.

## THE LIST OF PROSPECTIVE JURORS

Section 88 of the Code of Public Local Laws of St. Mary's County provides, in pertinent part, that it shall be the duty of the clerk to the County Commissioners to make out and file, annually at a time designated, with the clerk of the circuit court for that county a list of all male taxable residents of the county whose names appear on the tax books and who are not known to the clerk to be less than 25 nor more than 70 years of age. The provisions of the general law, Code, Art. 51, § 6 are substantially the same, although the designation of the taxable residents as "male" was deleted by Chapter 376 of the Acts of 1963. Persons over 70 years of age are exempted by Code, Art. 51, § 3. Code, Art. 51, § 8, providing that lists from which jurors are drawn shall include names of men and women and that no person shall be disqualified for service as a juror by reason of sex, originally was not applicable to St. Mary's County. Chapter 20 of the Acts of 1955 eliminated St. Mary's County from the listed counties in which the section was not applicable and provided that in St. Mary's County jury duty for women shall be optional; any woman whose name is drawn for jury duty shall be excused therefrom upon request properly made.[2] Section 88 of the local law was not expressly repealed by § 6 of the general law. Although St. Mary's County is not one of the counties to which § 6 is expressly made not applicable, § 6 states, "Special local laws exist for Anne Arundel and St. Mary's counties," and thus, it appears, does not repeal § 88 by implication. We think that, insofar as a list of taxable residents of St. Mary's County is necessary to the selection of jurors, § 88 of the local law is controlling as to its preparation, except that it must contain the names of both men and women, as we find that the limitation of taxable residents as "male" was repealed by Chapter 20 of the Acts of 1955.

2. Chapter 329 of the Acts of 1966 eliminated the option by women to serve but was enacted subsequent to the selection of the Grand Jury in the instant case.

10

The secretary to the Board of the County Commissioners of St. Mary's County, which position she said was the equivalent of being the clerk to such Board, there being no other person designated by the title of "clerk", testified, at the hearing on the motion to dismiss the indictment, that she did not furnish the court with a list of taxable residents between the ages of 25 and 70 years in 1965, and from her testimony, it appeared that she had not done so during the three years she had held the position. She said that Judge Dorsey told her that, to his knowledge, it had not been done in St. Mary's County during his tenure on the Bench. (Judge Dorsey qualified November 24, 1956). The fact that such a list was not prepared and furnished the Court is one of the grounds urged in alleging error in the denial of the motion to dismiss the indictment. We shall consider it with our consideration of the contentions with regard to the selection of the jury panel.

## THE SELECTION OF THE JURY PANEL

The Code of Public Local Laws of St. Mary's County, *supra*, § 89, provides:

"It shall be the duty of the judge or judges of the Circuit Court for St. Mary's County, not less than fifteen days before the commencement of each jury term of said court, in the presence of such members of the bar of said court as shall think proper to attend, notice of the time and place having been first given to said members of the bar, to proceed to select from the list provided for by Section 88 of this subtitle, and from the poll books of the several election districts of said county, which shall have been returned and filed in the clerk's office of the Circuit Court of St. Mary's County after any general election which has been last held before such election, a panel to consist of one hundred and fifty names of male citizens of said county, with special reference to their intelligence, integrity and sobriety, and without any reference to their political opinion, which said names shall be apportioned to the several election districts of said county, in proportion to the number of registered voters, and male taxpay-

ers in each of said respective districts; the said judge or judges shall then append to said list of one hundred and fifty names, a certificate certifying that said list has been selected in conformity to the provisions of this sub-title, and the said list and certificate shall be filed with the clerk of said court, and be by him preserved as other proceedings of said court are preserved."

The selection of jury panels is also covered by general law. Code, Art. 51, § 9. The general law differs from the local law, in a matter material to the question here considered, by adding "or from such other list of names as the court may find available," to the sources from which the panel is selected. Section 9 also contains a provision for the method of notice to members of the bar—"through the crier or clerk of said courts." (the circuit courts of the counties).[3] The section provides that it shall not apply to certain listed counties, "as to which special provision is made by the local law therefor," but St. Mary's County is not included as one of the counties to which the section is not applicable. It does state that it is "modified" as to St. Mary's (among other counties) "and special laws enacted." We feel, therefore, that the local law and the general law must be construed together and that the panel may be selected from the list provided for by § 88 of the local law, as construed heretofore in this opinion, and from the poll books of the several election districts in the county *or from such other list of names as the court may find available*.[4]

The appellant contends that the statutory requirements were not followed in three respects:

1) The panel was not selected from a list of taxable residents as no list was compiled.

---

**3.** By Chapter 668, Acts of 1966, notice is no longer required. This was enacted subsequent to the selection of the jury in the instant case.

**4.** The panel is not restricted to "male" citizens of St. Mary's County but may contain the names of men and women in view of Chapter 20 of the Acts of 1955.

2) Notice of the time and place of selection was not first given to members of the bar.

3) The apportionment provision was not correctly applied.

With regard to the list of taxable residents, Judge Dorsey testified that he selected the 150 persons comprising the panel. The selection was made in the office of the Clerk of the Court, which was open to the public. The panel was selected from a list of names obtained from many sources—former jurors, present jurors, the Supervisor of Assessments, Trial Magistrates, past jury lists. A record of names as prospective jurors was kept by the Clerk of the Court. All persons selected for the panel were checked against the poll books and tax records to ascertain if the persons listed were property owners or taxpayers or both. It is clear from the evidence that Judge Dorsey carefully considered the character and qualifications of the persons selected for the panel in an attempt to obtain those best qualified to serve as jurors, with due regard to their intelligence, integrity and sobriety. We feel that the list from which the panel was selected was "such other list of names as the court may find available" and was in compliance with the statute. But in any event, even if the local law were to stand alone, we see no error in the failure to have a list of all taxable residents. The local law was construed by the Court of Appeals in *King v. State,* 190 Md. 361. In that case, of the 150 names on the panel, at least 50 did not appear on the tax list and of those about 19 did not appear on the poll books, or if they did, they appeared on such books by different names or under different districts on the jury panel. At least two names did not appear on either the tax list or the poll books. But all the grand jurors who presented and indicted the appellant in that case, were either on the poll books or the assessments books of St. Mary's County. It was urged, as in the instant case, that the jury panel was not drawn from the poll books and the list of taxable residents, that the jury statutes, in plain and unequivocal language, stated what a judge must do in the selection and drawing of a jury to meet the requirements of the law, and unless the judge complied with the provisions of the statute in drawing the jury, the jury should be stricken down. The Court found that it is not necessary to show that the names were upon both the tax list and

the poll books and that selection from either was sufficient compliance with the law. It quoted from *Lee v. State,* 163 Md. 56, where the accused was charged with murder and sentenced to death, to the effect that the lack of lists specially prepared for the use of the judge and that the poll lists and tax books were scanned after selecting the panel rather than before was not material, so far as compliance with state law was concerned. It involved no substantial likelihood of unfairness, and should not be held to vitiate the trial unless the statute commands it. We so feel in the instant case.

With regard to the notice to members of the bar as to the time and place of the selection of the panel from the list of prospective jurors, members of the bar were notified of the names on the panel after it was selected. The appellant has made no actual showing of prejudice as a result of the lack of prior notice to members of the bar. In *State v. Madison, supra,* the Court said, at pages 268, 269 that "Where * * * unconstitutional discrimination is an integral part of the governing law, a defendant in a criminal case whose conviction has not become final is not required to show that he is prejudiced by the application of the law," and held that "where the system of jury selection *on its face provides for illegal discrimination and exclusion,* an actual showing of prejudice is unnecessary." (emphasis supplied) However, in *State v. Glascow,* 59 Md. 209, 212, the Court said, in construing a statute (not a constitutional provision) providing for the selection of grand and petit juries for Baltimore County:

> "The statute is to be regarded mainly as directory in its multifarious provisions; and unless any irregularities incident to carrying out its directions in good faith shall be shown to materially violate it, or so affect the juries as to prejudice the rights of the citizen, these irregularities should not be treated as fatal."

In *State v. Keating,* 85 Md. 188, at page 195, the Court said the opinion in *Avirett v. State,* 76 Md. 510 commented on the requirement that the names of jurors must be selected at the time of the drawing in the presence of such members of the bar and others as see proper to attend, "but it was not intended

to suggest that * * * private and previous selection of names would of itself invalidate the drawing of the jury." It held, page 198, "that although there be irregularities in the selection and drawing of a jury the proceedings will not be set aside, unless the Court can see that they have resulted, or may result, to the prejudice of the party accused." We think that the lack of prior notice to members of the bar did not invalidate the drawing of the jury. It did not result in an unconstitutional discrimination and, therefore, neither *Madison* nor *Schowgurow* is apposite, nor do they overrule *Glascow* and *Keating*. We do not see that it resulted or might result to the prejudice of the party accused.

With regard to the apportionment of the 150 names on the panel, § 89 of the local law provides that "they shall be apportioned to the several election districts of said county, in proportion to the number of registered voters, and male taxpayers in each of said respective districts." As before stated, we think that, in view of Chapter 20 of the Acts of 1955, "taxpayers" must include both male and female.[5] It cannot be ascertained definitely from the evidence that the 150 names had been or had not been apportioned to the election districts in proportion to the number of registered voters and taxpayers in each district. There was testimony that no list of taxable residents between the ages of 25 and 70 years was furnished the court prior to selection of the names from which the panel was selected and the data was not proffered at the hearing. The Clerk to the Election Board of Supervisors testified as to the total number of voters registered in the county and the number in each election district, but apparently these figures were not in the hands of the court at the time of the selection of the list. The evidence introduced permitted only determination of the apportionment with respect to the number of registered voters in each district, not taking into account the number of taxpayers. By the testi-

5. Although, Code, Art. 51, § 9 designates the number of names to be placed on the panel in certain listed counties and provides that in those counties "the names drawn on the panel shall be distributed among the several election districts in approximately the same proportion as required for drawing the list of regular jurors," St. Mary's County is not one of the counties listed.

mony of Judge Dorsey, the list of 150 names was selected with consideration to apportionment to the nine election districts by a formula previously worked out, as far as he knew, on the basis of population, which had remained fairly constant as to distribution since the formula was established. Although the question of apportionment in selection of jurors was not specifically discussed in *King v. State, supra,* it is inherent in that opinion that strict compliance with the apportionment provisions was not held to be required. We feel that the purposes of the statutes were accomplished in the selection of the grand jury which indicted the appellant, that no unconstitutional discrimination resulted, that any irregularity incident to carrying out the statutory provisions in good faith did not materially violate them or so affect the jury as to prejudice the rights of the appellant and we do not deem them as fatal.[6] The Court said in *King,* pages 371, 372:

> "Taking the testimony as a whole it is evident that the judge in selecting the jury tried to get men of intelligence, integrity, and sobriety and that in his search for jurors he was constantly on the lookout for men of this character. * * * It is the practice in this state, as was done in the case of *Lee v. State, supra,* for the judge to first select names 'from his contacts and information, as those of desirable residents of the county.' Judge Loker in his testimony stated that he tried to get men who were not interested in the matters to be tried. He tried to get disinterested parties; honest upright men; men whom he thought would do the right thing; men who would indict if they had proof before them necessary for an indictment, if it was proper to indict. Of course, a judge should select unbiased persons as jurors and those with no special interest in par-

---

6. The appellant does not contend that the selection of the grand jury from the panel was improper. It is clear that Code, Art. 51, § 10 (f) providing for the pellet system of selection of the jury from the panel, repealed § 90 of the local law as inconsistent therewith and does not require apportionment among districts on the jury itself.

ticular cases. This Court is of opinion that the testimony here shows that the judge followed this practice properly."

We think the language applicable to the instant case.

We find no error in the denial of the motion to dismiss the indictment.

The Code of Public Local Laws of St. Mary's County, Everstine (1965), § 94 states that the citizens of the village of Leonardtown "are and shall continue to be a body corporate by the name of 'The Commissioners of Leonardtown.'" This body corporate is hereinafter referred to as the "town." The members of the Board of Commissioners, hereinafter called the "Commissioners" are elected as provided by § 98. The Commissioners, by authority of § 101, may appoint a treasurer. In August of 1948 the appellant, a practicing attorney, was appointed treasurer and held that office for the next fifteen years. The town had no office of its own and moneys due by the citizens for taxes and utility services and other charges were paid in the appellant's office, either in person or by mail. For some ten months after his appointment, these payments, cash and checks, were kept by the appellant in a metal cash box in his law office pending deposit from time to time. In June of 1949, there was purchased, upon authorization of the Commissioners, a safe about the size of a three-drawer standard filing cabinet with an outer metal door secured by a combination lock and containing three unlocked drawers. This safe was kept in his office suite. Record was kept of the moneys received by a single entry bookkeeping system consisting essentially of a daily receipts journal, a procedure which had been used by the appellant's predecessor. A new bookkeeping system was installed in February 1963.

Jerry M. Colvin, Jr., a certified public accountant, testified that in December 1962 the appellant requested him to assist in the preparation of an annual report required to be submitted to the Fiscal Research Bureau of the State of Maryland. He said that the appellant told him that the Bureau had agreed that if a balance sheet was submitted as of June 30, 1962 and "the books set up at that point, so that future reports could be made

properly, they would accept that and start from that point on." The account balances were determined as of July 1, 1962, a set of books established and the secretary of the appellant was instructed as to how to keep them. In March 1963 Colvin met with the Commissioners and was employed by them to make an audit for the fiscal year ending June 30, 1963. The audit showed a deficit of $10,662.87. He asked the appellant how it could be accounted for and the appellant said bills would have been paid in cash. The appellant was asked if he had receipts for the bills so paid but such receipts were never produced. At a meeting of the Commissioners the accountant recommended that the bonding company be notified and that the Commissioners seek legal counsel other than the appellant (who was also the attorney to the town and clerk to the town), and inquired as to whether an audit of past years should be made. The appellant was called before the Commissioners and said that "he felt that he was solely responsible for these funds, that he would make it good" and urged that the bonding company not be notified as it "would be damaging to him." The appellant deposited $10,662.87 in the town's bank account in October 1963. The balance sheet prepared as of June 30, 1963 showed this sum as "Other accounts receivable" with the notation "This represents unaccounted for funds for the period July 1, 1962 through January 3, 1963, the responsibility for which the treasurer has assumed. The treasurer stated he located the funds in the treasurer's office. A deposit was made on October 14, 1963 covering this amount in full." [7] There was an investigation by the grand jury and in October 1964 Colvin was retained by the Commissioners to conduct an audit for prior years. The audit showed that during the period from the time the appellant assumed his duties as treasurer to the time the new bookkeeping system was installed the receipts as reflected

---

7. A witness called by the appellant testified that he loaned the appellant $10,000 in September or October of 1963. The appellant told him he was "in dire need of money, needed it very badly for personal occasion * * * it was a matter of utmost importance." He further testified that he had loaned the appellant $6,500 in 1957 or 1958 and in January 1965 the appellant still owed him between $12,000 and $13,000.

18

in the daily receipts journal exceeded the deposits in the town's bank accounts by $97,904.83. It also showed that the appellant had received $12,325 as salary in excess of that authorized by the Commissioners, although the evidence produced at the trial showed only $9,925 as one check on which the State relied could not be linked to the appellant. The general procedure followed in making the audit was to compare the total receipts in the receipt book for a fiscal year to the deposits made in the town's bank accounts for the period. It was found that there were amounts in the receipt book not deposited, cash amounts deducted from deposits at the time of deposit and amounts deposited which could not be identified in the receipt book. The total of the amounts showing in the receipt book but not deposited and the cash amounts deducted from deposits less the amounts deposited but not identified in the cash book determined the amount unaccounted for. This procedure assumes, necessarily, that the cash receipt book accurately reflected all moneys received by the treasurer. Cash amounts deducted from deposits made may be illustrated by reference to one deposit slip, State's Exhibit No. 15A. This slip, dated December 4, 1958, listed sixteen checks totaling $3,213.94 to be deposited to the account of the Commissioners of Leonardtown. There is noted on the slip "less cash $1,000.00" leaving a net deposit of $2,213.94. The $1,000 was given in cash to the person making the deposit. A teller from each of the banks in which the town had an account testified that they accepted such deposits and the amount designated as "less cash" was given to the appellant. Although the deposits were made by the appellant and various girls working for him, the "less cash" transactions were with the appellant. The tellers did not remember giving cash in such a manner to other than the appellant. One teller testified that the appellant told her he was going to deposit the cash in the other bank. There was evidence that there were instances when deposits were made on the same day in each of the town's two bank accounts but on no occasion was there a cash deposit in one bank in the same amount as the cash received in a "less cash" transaction from the other bank. There was "very little" cash deposited in the accounts. In one bank no cash was deposited from October 11, 1951 to March 17, 1958. In the other

bank there was no cash deposited from September 28, 1950 to March 25, 1959. Carbon copies of such deposit slips were kept in the appellant's office with the town's records but there was evidence that the copies did not show the "less cash" notation. The accountant asked the appellant why the duplicate deposit slips did not agree with the deposits shown on the bank statements and the appellant said, "I can tell you what is on the original tickets. It's not necessary to go to the bank, for the original tickets will show less cash or cash and the net figure being what was deposited in the bank." The accountant testified that when he asked the appellant what happened to the "less cash" he said "he would have made up the less cash on the ticket and instructed the girls to either take the deposit to one bank and get back the cash and carry the cash to the other bank." The appellant did not explain to the accountant why the "less cash" on the original deposit ticket was "never put on the duplicate." The audit showed that these "less cash" transactions first appeared on June 17, 1958 and June 24, 1958 for a total of $2,000. For the fiscal year ending June 30, 1959 they amounted to $12,501.26 and in succeeding years to June 30, 1963 were $7,650, $8,700, $9,800 and $8,050. The total amount of the "less cash" transactions was $48,701.26. This left the sum of $49,203.57 otherwise unaccounted for—the total of $97,-904.83 unaccounted for less the "less cash" transactions. For the period August 3, 1948, when the appellant was appointed treasurer, to June 30, 1949 the deposits made exceeded the amount shown on record in the receipt book by $65.89. Each fiscal year thereafter, however, there was a deficit, exclusive of the "less cash" transactions, ranging from $1,101.34 for the year ending June 30, 1950 to $7,578.95 for the year ending June 30, 1962.

At the close of the evidence offered by the State, the trial court denied motions for a directed verdict (which we consider as motion for judgment of acquittal) as to the second count of the indictment (embezzlement) and fourth count (larceny). The appellant thereafter offered evidence and by so doing withdrew the motions. Maryland Rule, 755b. The motions were again made at the close of all the evidence and denied. The case went to the jury on the second count of the indictment, charg-

ing embezzlement in violation of Code, Art. 27, § 129, and the fourth count charging larceny.

## THE CONVICTION OF EMBEZZLEMENT

The appellant contends that the treasurer of the town was a public officer and that any embezzlement by him would be a violation of Code, Art. 27, § 138. Therefore the conviction of the appellant under Code, Art. 27, § 129 was improper.

The Code of Public Local Laws of St. Mary's County, Everstine, (1965), § 101 provides that the Commissioners shall choose a president from their own body and "may also appoint a clerk to their Board, who may be one of their members, also a treasurer, who may be one of their members, and one and the same person may act as clerk and treasurer." Any of these officers "shall be subject to removal by a vote of the majority of the whole number of Commissioners, and the Commissioners shall prescribe the duties of the clerk and treasurer and fix their compensation by ordinance, when not otherwise prescribed by this subtitle." The duties of the treasurer are provided by § 102. He "shall receive all moneys that may be collected for taxes, fees, fines or otherwise, by any law or ordinance directly or through the bailiff, collector or otherwise, and all such moneys shall be paid out only by order of the Commissioners * * *. He shall subscribe to an oath for the faithful performance of his duties and give bond to the State of Maryland * * *." His books shall be open to the inspection of the Commissioners and any taxpayer and he shall annually render "a succinct and detailed statement of his receipts and disbursements for the fiscal year." We agree that between the treasurer and the town more than the ordinary attributes of service exist and that the relationship between the Commissioners and the treasurer is not merely one of master and servant, employer and employee, or principal and agent. The law imposes on the treasurer the duty to receive all moneys collected for taxes, fees, fines or otherwise, directly or through the bailiff, collector or otherwise (there is evidence that the appellant collected them directly). He must account for the money received to the taxpayers as well as the Commissioners. He thus has independent functions and duties beyond those prescribed from time to time by the Commission-

ers appointing him and, we feel, has been delegated by law to exercise some of the functions of government for the benefit of the people. He is required to subscribe to an oath for the faithful performance of his duties and to give bond to the State of Maryland conditioned for the faithful discharge of his duties. We think he is a public officer. *Moser v. Howard County Board,* 235 Md. 279; *Howard County Comm. v. Westphal,* 232 Md. 334; *First Continental v. Director,* 229 Md. 293; *Gary v. Board of Trustees,* 223 Md. 446; *Hetrich v. Co. Commissioners,* 222 Md. 304; *Pressman v. D'Alesandro,* 211 Md. 50; *Buchholtz v. Hill,* 178 Md. 280; *Calvert Co. v. Monnet,* 164 Md. 101; *Truitt v. Collins,* 122 Md. 526; *School Comm'rs. v. Goldsborough,* 90 Md. 193; *State v. Denton,* 74 Md. 517; 50 *Op. A.G.* 190 (1965).[8]

We do not agree, however, that the conviction of the appellant under Code, Art. 27, § 129 was improper for this reason, even assuming that he was required by law to account, pay over or deliver the moneys received by him to a person authorized by law to receive the same. See *State v. Denton, supra; State v. Archer,* 73 Md. 44. Section 129 provides, in pertinent part:

> "Whosoever being * * * a * * * officer * * * to any body corporate * * * shall fraudulently embezzle any money * * * which * * * shall be delivered to or received, or taken into possession by him, for or in the name or on account of his * * * employer, shall be deemed to have feloniously stolen the same from his * * * employer, although such money * * * was not received into the possession of such * * * employer, otherwise than by the actual possession of his * * * officer * * *."

The appellant as treasurer was an officer of the town, a body

---

**8.** We do not have before us and we do not decide whether that provision of the Code of Public Local Laws of St. Mary's County, Everstine (1965), §101 authorizing the treasurer to be a member of the Board of Commissioners violates Article 35 of the Maryland Declaration of Rights declaring that no person shall hold more than one office of profit created by the Constitution and Laws of this State. The appellant here was not a commissioner.

corporate. Money was delivered to, or received or taken into possession by him for or in the name or account of the town and, assuming for the purpose of the question now being considered, he fraudulently embezzled the money, he clearly is within the provisions of § 129. The appellant argues that he also falls under the provisions of § 138 pertaining to embezzlement by "any person holding office in this State, whether elected or appointed * * * by any * * * authority legally authorized to make such appointments" of any money "which he is by law bound to pay over, account for, or deliver to the Treasurer of this State, or to any other person by law authorized to receive the same * * *." Under § 138 the crime is a misdemeanor with a maximum penalty of 10 years; under § 129 the crime is a felony with a maximum penalty of 15 years. The appellant urges that since he is under the provisions of § 138 he cannot be convicted under § 129. This State has other embezzlement statutes, in addition to § 129 and § 138—§ 128, embezzlement by a bank president or director; § 131 embezzlement by insurance agents, solicitors or brokers—in an apparent attempt by the legislature to assure that a person fraudulently embezzling property will be brought to justice. We find no language in the statutes prohibiting the conviction of a person violating one statute because he may also violate another and the appellant cites no authority in this State to support this contention. He cites *Robertson v. State*, 192 N. E. 887 (Ind. 1934). Indiana had two embezzlement statutes specifying persons in designated categories. The more general statute conceivably encompassed all those persons in the more restrictive statute. The general statute included "agents" and the more restrictive included "factors." The defendant, a factor, was convicted under the general statute. The rationale of the opinion was that if under the facts and evidence the defendant was guilty under the general statute, the enactment of the more specific was useless and since the latter had not been repealed, effect must be given to it. We are not persuaded to adopt this reasoning with regard to § 129 and § 138. A person may hold office as defined in § 138 without being a person subject to the provisions of § 129 and a person may violate § 129 without violating § 138. The enactment of § 138 cannot be said to be useless unless effect is given to it in this case.

The appellant was clearly under the provisions of § 129 and we feel that because he held office in this State does not preclude his conviction under that section.

The appellant also contends that a fatal variance existed between the second count of the indictment which presented that the appellant on July 1, 1949 and then continually up to and including June 30, 1963 "feloniously and fraudulently did embezzle from the Commissioners of Leonardtown, a Municipal Corporation, of the State of Maryland, in the sum of $110,229.-83, United States Currency, the property of the said Commissioners of Leonardtown" in violation of Art. 27, § 129 of the Annotated Code of Maryland, and the evidence which, he alleges, showed that the "local banks were the owners of the money" given to the appellant by reason of the less cash transactions. The trial court, in its instructions to the jury, said:

> "The only evidence that, if true, would permit a conviction of embezzlement in this case is the evidence that relates itself to the so-called less cash transactions, the defendant is alleged to have had with the First National Bank and the Maryland National Bank and the latter's predecessor bank."

There was evidence that the appellant, from time to time, received checks on account of the town in his capacity as treasurer, that these checks were restrictively endorsed for deposit only to the account of the town and listed on a deposit slip for deposit in the town's account. On the deposit slip the appellant designated a specific amount of cash with the notation "less cash" and upon presenting the deposit to the bank received, in cash, the amount so designated by him. The difference between the total amount of the checks and the cash received by him was credited to the town's account. Between June of 1958 and June 30, 1963 there were some 50 of these transactions totaling $48,701.26. The appellant urges that the banks were obligated to credit the full amount represented by the checks to the accounts in the name of the town because of the endorsement of them for deposit only and that since this was not done, the cash given the appellant without authority was not the town's money but the bank's money, the banks being liable to the town for the

full amount of the checks when they were collected.[9] Therefore, he states, the money was not stolen from the Commissioners of Leonardtown and if a crime was committed it was against the banks. Of course, we do not have before us the civil liability of the banks, and although authorities are cited by the appellant with respect to civil responsibility to show what he claims to be the nature of the transaction, we do not think them conclusive as to the question of the criminal responsibility of the appellant. We do not feel that the negligence of the banks, if they were negligent, or that the procedures followed by the banks, which may have facilitated the activities of the appellant, relieve him of his criminal responsibility. We have heretofore set out the pertinent parts of Code, Art. 27, § 129. It is not disputed that the appellant had been appointed and was serving, at the time of these transactions, as treasurer of the town. There was sufficient evidence that the cash was received by the appellant and proper inferences therefrom for the jury to find that he appropriated it to his own use. Although the statute makes the offense larceny and, therefore, an indictment which does not allege ownership of the money embezzled is not sufficient to sustain a conviction, *State v. Tracey*, 73 Md. 447, and although failure to prove ownership as laid in the indictment is material, an allegation of the ownership of stolen goods may be supported by proof of any legal interest, or special property in the goods. *Flannigan v. State*, 232 Md. 13 (false pretenses) ; *Richardson v. State*, 221 Md. 85 (larceny) ; *Lee, etc. v. State*, 238 Md. 224 (robbery). Each bank credited to the account the amount of the deposit less the cash given the appellant. The result was to reduce the bank's debt to the town, arising from the deposit of the checks when collected, by the amount of the cash received by the appellant. Certainly, had the checks not been collected by the bank in which they were deposited, the full amount represented by the unpaid checks would have been charged to the town's account. The premise on which

9. Code, Art. 11, § 121, in effect at the time of these transactions, provided that an endorsement of an item by a depositor "for deposit" was deemed a restrictive endorsement and indicated that the endorsee bank was an agent for collections and not the owner of them.

the appellant's contention rests is that, even though he initiated the transactions, the bank had no legal right to pay him the cash from checks payable to the town and endorsed for deposit. He urges that absent this legal right, the town could not be said to own it or have any legal interest or special property in it. We do not think that such civil responsibilities as may exist by the bank to the town, by the appellant to the town or between the bank and the appellant are conclusive with respect to ownership of the cash so paid. It is inescapable that the appellant received money for the town by reason of checks payable to it. It is noted that when a third person steals goods from a bailee having a special right of property therein, it may be treated as larceny either from the general owner or from the bailee, and the indictment may lay the ownership in either. *Richardson v. State, supra; Clark and Marshall Crimes,* 6th Ed. § 12.03. We think that there was sufficient evidence for the jury to find that the town was the owner, or had a legal interest or special property in the money and that therefore there was no fatal variance between the *allegata* and the *probata.*

## THE CONVICTION OF LARCENY

The appellant contends:

1) the evidence was not sufficient to sustain the conviction of larceny.
2) the trial court erred in the instruction to the jury that the abstraction of money from the town's safe was larceny and not embezzlement.

This Court has the duty, when the question is properly preserved, to review the sufficiency of the evidence in a criminal case tried before a jury. The test as to the sufficiency of the evidence in such a case is whether any relevant evidence was given to the jury which would have properly sustained the conviction. *Graef v. State,* 1 Md. App. 161; *Borman v. State,* 1 Md. App. 276. However, this Court will not inquire into or measure the weight of the evidence, and will not reverse the judgment if there is any proper evidence before the jury on which to sustain a conviction. *Shelton v. State,* 198 Md. 405, 412. When guilt is based solely upon circumstantial evidence

26

there is a further requisite. In *Vincent v. State,* 220 Md. 232, at page 237, the Court said:

"In every criminal case, evidence, to meet the test of legal sufficiency, must show directly, or support a rational inference of, the facts required to be proved; and the facts must be established, or the inference supported, beyond a reasonable doubt or to a moral certainty, or a reasonable doubt of an opposite fact must be created. * * * And, when guilt is based solely upon circumstantial evidence, the circumstances, taken together, must be inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence."

The first contention presents two questions in the application of the test as to the sufficiency of the evidence: first as to the criminal agency of the appellant, and second, as to the possession of the money taken from the town's safe. The evidence is undisputed that the appellant was treasurer of the town during the period August 3, 1948 to June 30, 1963 and, as before detailed, during this period the receipts collected by the appellant for the town exceeded the deposits in the town's bank accounts by $49,203.57, exclusive of "less cash" transactions. The appellant argues that only circumstantial evidence connected him with this shortage and, in effect, the circumstances taken together, are not inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence. There was evidence that the safe was kept in the law office suite, was open during the business day and anyone and everyone working in the office apparently had access to it from time to time. During his tenure in office the appellant or the law firms with which he was associated employed some 16 girls as secretaries or clerks in various capacities, some for as short a period as one week, others for some years. Apparently none had access to the safe during the entire period. The appellant urges that since the evidence showed that he did not have exclusive access to the funds, the various secretaries, clerical help and his law partners having access to the safe, and since some of them, but not all, testified that they individually did not take money from the safe

for personal use, the test as to the sufficiency of the evidence was not met. We deem it significant, however, that the appellant had access to the safe for the entire period involved and that there were funds unaccounted for in each fiscal year from July 1, 1949. It does not appear to us to be a "reasonable hypothesis or theory of innocence" that in each of these years there would be another and in most years a different person having access to the safe who was a thief and that this would have been unknown to the appellant. There was evidence that the appellant took cash from the safe—"I'd see him go to the drawer and say he was going to borrow some money"—and that on occasions there were I.O.U.'s in the drawer in the appellant's handwriting. One of the secretaries who received moneys paid to the town as the employee of the appellant and made appropriate entries in the daily cash book, testified that, sometime after 1957, she was instructed by the appellant not to deposit any cash in the town's account and there was no reasonable explanation offered as to why such instructions were given. As a matter of fact there was "very little" cash ever deposited and for a period of some seven years, no cash deposits were made in either of the town's accounts. This must have been obvious to the appellant yet there was no evidence that it evoked any inquiry from him. In explanation of receipts unaccounted for in the fiscal year ending June 30, 1963, during which the audit showed a deficit of $10,662.87, the appellant told the accountant that bills were paid in cash, but receipts for such bills were never produced and there was evidence that the appellant was not authorized to pay bills in cash, except small "petty cash" items. The appellant told the town commissioners, at a meeting at which he appeared, that during that period three secretaries worked for him who had since left his employ, and that they had taken the money. For the fiscal year ending June 30, 1963, $8,050 was shown to be cash received on "less cash" transactions, $3,327.10 was entered in the receipt book but not deposited and $714.23 was deposited but not entered in the receipt book. Two of the secretaries who worked for the appellant during that time denied on the witness stand that they took any money from the safe for personal use and the third testified that she took money out of the cash box only for the

purpose of purchasing stamps. Despite the allegation that the secretaries had taken the money, the appellant offered to take no salary until it was repaid saying, "I'm responsible, I'm responsible for this and I'll stand responsible for it." When asked by the commissioners why they should not immediately proceed against the people who might have taken the funds, the appellant stated that "the time element and the fact that these people had moved and that they would be difficult to get, was one factor" and the other factor was he felt that if he would be permitted to replace the funds for which he assumed the responsibility, "that it would be much simpler and that it would prevent any undue publicity." He did not want the bonding company notified as "you might just as well put it in the newspapers." He deposited $10,662.87 in the town's account on October 14, 1963 and although he told the accountant as set forth in the balance sheet prepared that "he located the funds in the treasurer's office," there is evidence that he borrowed $10,000 about this time from a friend for a "matter of utmost importance" as he was in "dire need of money, needed it very badly for personal occasion." The shortage during the fiscal year ending June 30, 1963, exclusive of the "less cash" transactions, was in excess of $100, sufficient to constitute grand larceny, and for that period, at least, the question of who took the money appeared to be narrowed to the appellant and the three secretaries by the statements and actions of the appellant. Beginning in June 1958 there was also the evidence of the appellant's activities in the "less cash" transactions and while guilt cannot be established by proof that an accused committed other crimes "it is firmly established that evidence of acts may be admitted to show motive, intent, absence of mistake or accident or a common scheme, or identity embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other." *Cole v. State,* 232 Md. 111, 120-121; *Purviance v. State,* 185 Md. 189; *Bell, alias Kimball v. State,* 57 Md. 108, 114.

We feel that the test of the sufficiency of the evidence to submit the case to the jury was met with regard to the criminal agency of the appellant. As the Court said in *Jones v. State,* 242 Md. 323, 328:

"Proof of guilt beyond *all possible* doubt has never been required in criminal cases, and it is thus 'not necessary that every conceivable miraculous coincidence consistent with innocence be negatived.' "

We find no error in the denial of the motion of judgment of acquittal on the ground of the criminal agency of the appellant.

The appellant further contends that there was error in the denial of the motion for judgment of acquittal on the larceny count on the ground that the evidence did not show that the funds were in the actual or constructive possession of the town. He urges that if the moneys were not in the actual or constructive possession of the town, the crime is not larceny but embezzlement.

It is clear that larceny is an offense against possession, and that there must be a taking sufficient to constitute a trespass. *Brown v. State,* 236 Md. 505, 513; 2 *Wharton's Criminal Law and Procedure* (Anderson) § 464; *Clark and Marshall, Crimes,* 6th Ed. § 12.03. The early English cases held that since a servant, receiving property of his master from a third party, obtained possession and not mere custody, the servant could not be guilty of larceny until he gave up possession to the master. *Rex v. Bazeley,* 2 Leach 835, 168 Eng. Rep. 517 (1799). Other early cases noted, however, that possession could be transferred to the master merely by placing the property in some receptacle provided for that purpose by the master. *Regina v. Reed,* 6 Cox's Crim. Cases, 284 (1854). In answer to such cases as *Bazeley,* the first embezzlement statute was passed in England in 1799. 39 *George III,* Ch. 85 "The English courts consistently refused to treat these statutes as an extension of common-law larceny, and insisted that they were passed solely and exclusively to provide for cases which larceny did not include." Note, *18 Md. L. Rev.* at page 239. The Court of Appeals of this State has adopted and follows this view of the Maryland embezzlement statute, (Code, 1967 Replacement Volume, Art. 27, § 129), *Nolan v. State,* 213 Md. 298, even though the fine distinction between larceny and embezzlement has been avoided in its place of origin by statutory enactment. 6 & 7

*Geo. V,* Ch. 50, § 44. We think it clear that, in Maryland, the embezzlement statutes do not absorb all cases of larceny by servants, agents or employees.

> "If a servant takes goods out of the master's posses-
> sion, the crime is larceny, but if he takes goods before
> these reach his master's possession, the crime is em-
> bezzlement. * * * [I]f the case is larceny at common
> law because the money was taken from the prosecu-
> tor's possession, the charge of embezzlement fails. The
> embezzlement statutes were passed, not to cover any
> cause within the common-law range of larceny, but to
> cover new cases outside of that range. * * * Goods
> which have reached their destination are constructively
> in the owner's possession although he may not yet
> have touched them, and, hence after such termination of
> transit, the servant who converts them is guilty of
> larceny, not of embezzlement." *Nolan v. State, supra,*
> pages 313, 314.

The general rule is, therefore, that when a servant receives money from a third person to take to his master, such money is in the possession of the servant until it reaches the master or until it is placed in the master's receptacle or depository for the master,[10] *Perkins on Criminal Law,* (1957), Ch. 4, Sec. 1 B2c, and there is sufficient trespass against the possession of the owner when the property is in his constructive possession as distinguished from his actual possession. *2 Wharton's Criminal Law and Procedure* (Anderson) § 465. It is recognized that "possession," in this concept, is frequently a tenuous term, and it must be distinguished from "custody" in a given factual situation to ascertain whether the crime is larceny. However, from an examination of decisions a rationale emerges, by the application of which cases seemly at variance are reconciled. We think that the basic case is *Regina v. Reed, supra,* in which the servant was sent by the master in the master's cart to pick up coal to be placed in the master's sacks. The sacks were filled

___

**10.** The principle is generally applicable also in employer-employee and principal-agent relationships. We shall refer only to master and servant for brevity.

and loaded on the cart. The servant misappropriated them on the way to the master's house. Holding that if the servant did anything which terminated his original possession of the goods, so that the master thereby became constructively into possession, and the servant afterward converts them he was guilty of larceny, Lord Campbell, C. J., said, page 290:

> "The prosecutor was undoubtedly in possession of the cart at the time when the coals were deposited in it; and if the prisoner had carried off the cart *animo furandi,* he would have been guilty of larceny. * * * There seems considerable difficulty in contending that, if the master was in possession of the cart, he was not in possession of the coals which it contained, the coals being his property, and deposited there by his order, for his use. Mr. Ribton argued that the goods received by a servant for his master remain in the exclusive possession of the servant till they have reached their ultimate destination. But he was unable, notwithstanding his learning and ingenuity, to give any definition of 'ultimate destination,' when so used. He admitted that the master's constructive possession would begin before the coals were deposited in the cellar, when the cart containing the coals had stopped at his door, and even when it had entered his gate. But I consider the point of time to be regarded is that when the coals were deposited in the cart. Thenceforth, the prisoner had only the custody or charge of the coals, as a butler has of his master's plate, or a groom has of his master's horse."

In *Regina v. Wright,* Dears & B. Crown Cas. 431, 7 Cox's Crim. Cases, 413 (1858), the defendant managed, from his own shop where he conducted another business, a branch office of a bank. He deposited money received for the bank in a safe provided by the bank for that purpose. There were duplicate keys to the safe and the bank had possession of one of them. The defendant received money, paid checks, and furnished the bank a weekly report of the money received, paid out and the balance on hand. The evidence did not show directly whether he ap-

propriated the money from receipts before or after he put it in the safe. The Crown contended that, although the defendant had the custodial care of the money, it was in the constructive possession of the bank from the time it was placed in the office safe. Lord Campbell, C. J. said:

> "When the money was placed in that safe, which was furnished by the employer, and of which the employer had a duplicate key, the exclusive possession of the prisoner was determined. The money being so deposited in the safe and afterwards taken out of the safe by the prisoner *animo furandi,* he was guilty of larceny."

In both *Reed* and *Wright,* the receptacle in which the property given the servant for the owner was in the constructive possession of the owner. In *Reed* the cart was the property of the owner and only custody thereof given to the servant for a specified purpose and temporary use. In *Wright* the custody of the safe, rather than possession of it, in the defendant, was shown by the duplicate key kept by the bank. In *Morgan v. Commonwealth,* 47 S. W. 2d 543 (Ky.), holding the crime was embezzlement, not larceny, the safe from which the money was taken, was provided by and belonged to the company. The combination was known only to the defendant although a copy of the combination was filed in a sealed envelope in the main office of the company in another city. The court found that the money was in the possession of the defendant until forwarded to the company. It reasoned that, although the company could, by opening the sealed envelope, apprise itself of the combination, it remained in ignorance of it and the defendant was the only one who had actual access to the safe. It is apparent that the safe was in the possession of the defendant and not merely in his custody. By not having actual knowledge of the combination, and thus no access to the safe, the intent was clear that the company did not desire and in fact did not have control over it. Applying the rationale in *Reed,* the exclusive possession of the company's money in Morgan was not terminated when he placed it in a receptacle of which he had legal possession and not merely custody. In *Weldon v. State,* 17 Ala. App. 68, 81 So. 846, in which a conviction for embezzlement was

sustained, the receptacle was not in the possession of the employer but was furnished by the defendant himself, for his own convenience, and not furnished by the employer as a regular depository. *Warmoth v. Commonwealth,* 81 Ky. 133, states unequivocally that where an agent is putting funds in a depository of the principal provided by the principal, the principal or superior agents must have access or control over the depository to constitute a taking therefrom the crime of larceny. *Warmoth* cites as authority only *Johnson v. Commonwealth,* 5 Bush 430 (Ky. 1869) which cites no authority for the rule and was a matter of the interpretation of a statute. But the access or control by the principal would be indicative that the agent had only custody of the depository and that his exclusive possession of the funds terminated when placed in a depository, the constructive possession of which was in the principal.

We feel, therefore, that the rule of law is that a taking *animus furandi* of money or chattel after being received by a servant for his master and placed by the servant for his master in a depository which is in the actual or constructive possession of the master at the time of the taking, is larceny. Ownership of the depository by the master is not conclusive of possession in him, but access to and control of it are indicia of possession, the ultimate fact of which is determined by the circumstances in each case. By the servant placing the property in a depository in the possession of the master, the servant's exclusive possession of the property is terminated, and the subsequent taking is a trespass.

The question here, therefore, is whether the safe in which the funds were placed was in the actual or constructive possession of the town or the appellant. By resolution of the Commissioners of Leonardtown of June 7, 1949, a "fire-proof, safe-lock filing cabinet" was purchased. This safe was kept in the law offices of the appellant which were located at various addresses in the town during the period charged in the indictment. The appellant had the combination to the safe and access to it. Each of the Commissioners and former Commissioners who testified stated that he did not know the combination to the safe. There was evidence that the individual Commissioners were aware that there was a safe and where it was located and

that the town's records and funds were kept therein but there was no evidence that any Commissioner at anytime entered the safe or specifically requested access to it. On these facts alone, if the appellant were only an employee of the town, he would have had possession of the safe and the placing of the money in the safe, would not terminate his exclusive possession of the money. A subsequent taking would constitute embezzlement and not larceny. But we have found that the appellant, as contended by him, was not merely an employee or servant of the town, but a public official, an officer—the treasurer—of the town body corporate. As such he had an identity with the town apart from his relationship as employee of the Board. Thus, his access to and control of the safe, owned by the town, was the access to and control of the town and the safe was in the constructive possession of the town and only in the custody of the appellant. We find *Nolan v. State, supra,* applicable. In that case the corporation provided the receptacle, a cash drawer, in which the money was deposited as received. Two officers of the corporation, in addition to the defendant, an employee, accepted money and had access to the cash drawer. The Court held that the money, taken by the defendant after it was placed in the cash drawer, was in the possession of the corporation. Obviously access to the receptacle by officers of the corporation was sufficient to place possession of it in the corporation. We think the access, by the appellant, as an officer of the town— its treasurer—to the safe, furnished and owned by the town, was sufficient to find that the safe was in the constructive possession of the town, and that it was not necessary, under these circumstances, that such access be by the town independent of the appellant. So when the money received by the appellant for the town was placed in the safe, the money was in the possession of the town, and the appellant's exclusive possession of the money was terminated. As Judge Crowder said in *Regina v. Wright, supra,* and quoted in *Nolan,* at page 313:

> "The fact that the prisoner had the entire control over the premises makes no difference. If he took the money from the safe for the purposes of the bank, he did so as part of his duty; but if he took it for his own purposes he was guilty of larceny."

We find no error in the denial of the motion for judgment of acquittal on the larceny count on the ground that the evidence was not sufficient to show the money was in the possession of the town.

We do not feel that the trial court committed reversible error when it instructed the jury with respect to money taken from the safe. At the beginning of its charge the Court said:

> "Under the laws of Maryland, the jury is the judge of the law as well as the facts in a criminal case and therefore, the instructions I give in this case are advisory only and in no sense binding upon you. This does not mean that you should decide that the law is what you wish or desire it to be but means that you should, in keeping with your oath, to well and truly try the issue joined between State and defendant, decide what the law of this case is and then to apply that law to the facts as you find those facts."

It explained the fourth count of the indictment charging the common-law offense of larceny. It further said regarding the fourth count:

> "As to Count IV of the indictment charging larceny, you are instructed that this offense requires as a necessary element of its commission, a taking from the possession of the town of Leonardtown and because it is a body corporate impolitic, can not in law be considered in possession of its funds until you find that such funds were actually deposited in the safe owned by it and intended to be utilized for the reception thereof. You are instructed accordingly, that the defendant can not be convicted under Count IV of the indictment unless and until you are convinced by the State beyond a reasonable doubt and to a moral certainty that the defendant took and carried away funds from the safe with an intent to deprive the town of Leonardtown of such funds permanently. If you do so find, your verdict under Count IV should be guilty. If there is a reasonable doubt that the defendant took the funds

from the safe or if there is a reasonable doubt of an intent to deprive the town of its ownership of such funds permanently, your verdict as to Count IV should be not guilty."

The basis of the appellant's contention as to the instructions is that "the facts in this case establish that the receptacle involved, the Town's safe, was itself in his possession, as opposed to that of the Town. Since this was true, the funds when placed in the safe by his secretaries or by him, remained in his constructive possession, so that any subsequent abstraction by him from the safe would be embezzlement, and not larceny." In view of our holding on the matter on which the contention is based, and considering the instructions as a whole, we find no prejudicial error in the specific instruction to which exception was made. It was clearly presented that the jury must find "a taking from the possession of the town."

## THE SALARY OVERPAYMENTS

As before detailed, of the $110,229.83 charged in the indictment in each of the embezzlement and larceny counts, $12,325 represented salary received by the appellant in excess of that to which he was entitled. Before evidence on this matter was proffered, there was discussion, out of the presence of the jury, by counsel for the appellant and the State's Attorney with the Court, counsel for the appellant contending that such evidence was not admissible on the grounds, in effect, that if it were a crime at all it was false pretenses, which was not charged, and that it was not money that was so obtained but checks. When the evidence was proffered before the jury, the Court, with agreement of Counsel made out of the presence of the jury, told the jury:

"* *·* [Y]ou should draw no inference unfavorable to either side from the fact or circumstance that either the State's Attorney or his assistant or defense counsel or his assistant may, from time to time, enter possible objections. This is the only manner in which they can direct the attention of the Court to a question of law that frequently arises in connection with admis-

sibility of evidence. It calls the attention of the Court to a certain particular thing in the minds of counsel and this is the only method by which counsel may protect the rights of their client during the course of the trial; the only manner in which they can, from time to time, by requesting the Court, to seek a ruling by the Court with respect to a controverted legal issue. So please don't, because either Mr. Norris or Mr. Hogan or the other counsel in the case from time to time may make an objection or request the opportunity to discuss the matter with the Court, don't draw any inference unfavorable to anyone on this account or neither draw an inference in connection with any ruling the Court may make in regard to any objection on it because the Court's action, whether It sustains or overrules a particular objection, is acting in Its capacity in Its connection with the authority that is given to the Court to rule upon the admissibility of evidence, and if it is necessary to make a ruling, don't draw any inference harmful to either side on account of the nature of the ruling."

The Court overruled objections to the evidence relating to the salary overpayments. The appellant concedes that he "had absolutely no factual defense to the salary overpayments. There was no question that these salary overpayments occurred, and there was no question that the appellant was not entitled to the salary represented by them." There was evidence that the appellant had requested in 1956 some of the Commissioners, individually, to allow him an advance of $10,000 on his salary to be paid back by his not drawing salary for about three years, and that $9,-925 had been received by the appellant in excess of salary due him as shown by the minutes of the Commissioners. There was detailed evidence produced by the defense as to the financial status of the appellant during the period covered in the indictment including an "expert witness in the capacity to try to bring together this financial data." The trial court, after making clear that its instructions were advisory only, said:

"You are instructed that you cannot, in law, find the defendant guilty under either Count II or Count IV

because of any checks issued to the defendant for salary without regard to whether there was or was not an overpayment created thereby."

The appellant contends on this appeal that "the trial court's error in admitting evidence of salary overpayments as substantive proof of the charges in the indictment was not and could not be cured by an advisory instruction that the evidence was not to be used for this purpose." We see no merit in this contention. The jury had no knowledge of why the evidence objected to was admitted, assuming the appellant's allegation as to the reason to be correct, and was told by the Court that it was not to draw any unfavorable inferences from the overruling of objections to its admission. It was instructed that it was not to consider such evidence in its determination of guilt under either count before them. We find that the appellant was not prejudiced by the admission of such evidence in view of the circumstances and the instructions of the Court to the jury. *Farrow v. Warden,* 241 Md. 724. In any event we think that the evidence was properly admissible as evidence of "acts to show motive, intent, absence of mistake or accident or a common scheme, or identity embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other." *Cole v. State, supra; Purviance v. State, supra.* It was also relevant to the financial status of the appellant, evidence as to which was introduced by him.

*Judgments affirmed.*

THOMPSON, J., dissenting:

I agree with the findings of the majority with one exception. I do not think that the fact that the appellant was a public official, and an officer—the treasurer of the town body corporate, was sufficient to place the constructive possession of the safe in the town. In each of the cases cited by the majority as authority for the finding on this question there was present a factor not present in the instant case — access to the depository by the owner of the funds independent of the accused. This access was through a third party officer of the owner or by actual knowledge of the owner of the combination of the depository lock or

by possession of a key to it. Although I concur that the rule on the point is as stated by the majority, I believe that, applying the rule to the facts of this case, the town safe was in the possession of the appellant and not merely in his custody. Therefore, when the funds were placed in the safe, the exclusive possession of the appellant was not terminated, and the subsequent taking of the funds by him, *animus furandi,* was not larceny but embezzlement. Since the trial judge instructed the jury that the "only evidence that, if true, would permit a conviction of embezzlement in this case is the evidence that relates itself to the so-called less cash transactions," I would reverse the judgment on the larceny count of the indictment. In reaching this conclusion, I fully realize that this approach is highly technical, but I think the Court is bound by the ruling of the Court of Appeals in *Nolan v. State,* 213 Md. 298.